MARTIN GOMEZ, ON BEHALF OF HIMSELF AND HIS MINOR
CHILDREN, KASSANDRA B. AND NICHOLAS B., APPELLANT, V.
KAREN M. SAVAGE AND TIMOTHY L. SAVAGE, APPELLEES,
AND ANITA A. BECHTOLD, INTERVENOR-APPELLEE.

580 N.W. 2d 523

Filed June 26, 1998. No. S-97-333.

Peter T. Hoffman, of University of Nebraska Civil Clinical Law Program, for appellant.

Herbert J. Elworth, of Casey & Elworth, and Mark R. Widell for appellees and intervenor-appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CONNOLLY, J.

In this appeal of a habeas corpus action seeking custody of two minor children, we are required to determine the competing interests of the appellant father, Martin Gomez; the intervenor-appellee mother, Anita Bechtold, who relinquished the children for adoption and later revoked the relinquishment; and the proposed adoptive parents, appellees Karen M. Savage and Timothy L. Savage. The district court determined that Bechtold's revocation was valid, that Gomez was unfit to have custody, and that it would be in the best interests of the children to remain in the custody of the Savages. We affirm as modified.

## BACKGROUND

Gomez and Bechtold began dating when they were teenagers, and on July 23, 1982, they had a child, Jamie. Although they never married, Gomez and Bechtold began living together in 1984. The couple had two more children, Kassandra, born May 4, 1986, and Nicholas, born July 17, 1989, who are the subjects of this litigation. Gomez was not identified as the father on any of the children's birth certificates. However, the parties do not contest that he is the biological father.

Gomez did not assist with payment for the births of any of Bechtold's children. However, Gomez was present in the birthing room when Nicholas and Kassandra were born. In or about 1986, Gomez left Bechtold and the two children for about 6 months and moved to Kansas. During that time, he provided no support for his children and did not make contact with them or their mother. However, Gomez and Bechtold reunited in December 1987. During the time that Gomez and Bechtold were together, Gomez assisted with the housework, cooking, and care of the children. Gomez also attended parent-teacher conferences, attended school functions, and gave the children birthday gifts.

During the periods of time that Gomez and Bechtold lived together, Gomez partially supported Bechtold and the children with his wages, unemployment income, and a workers' compensation settlement. Bechtold received public assistance and attended cosmetology school for 14 months. Bechtold began a career in hairstyling in 1989.

According to Bechtold, Gomez used alcohol and marijuana during the periods of time they were together, and occasionally used crank, an illegal narcotic. Bechtold further testified that Gomez physically and mentally abused her and was "mean" to her and the children.

Gomez and Bechtold separated on August 10, 1990, after Gomez became involved with another woman whom he subsequently married. Gomez' wife has two children from a previous relationship and has one child fathered by Gomez. Following the separation, Gomez maintained some contact with his children but provided little financial support. The record is in conflict regarding how much time Gomez spent with his children after the separation. Gomez indicates that he spoke with the children by telephone several days each week and kept the children for overnight stays, weekends, and other visits. Bechtold indicates that Gomez called and visited the children less often than that.

According to Bechtold, between August 10, 1990, and November 1, 1991, the only support Gomez provided was approximately $50 in cash, along with the purchase of mittens and hats for the children and school supplies for Jamie. Bechtold testified that the total value of support from Gomez during this period was around $150. Gomez contends that he also provided diapers, toys, clothing, and hygienic items. Gomez preferred to provide support by buying items for the children rather than by giving cash to Bechtold because he did not trust her to buy things for the children.

### RELINQUISHMENT AND PLACEMENT FOR ADOPTION

During the summer of 1991, Bechtold determined that she could not take care of the children by herself and concluded that she could not rely on Gomez for financial support. Bechtold then decided to place the two younger children for adoption. Bechtold discussed adoption with Gomez, who told her he would not consent to placing the children for adoption. According to Bechtold, Gomez told her that he was saving money in order to get married and buy a house, and would not help Bechtold financially until after he and his new wife settled in. However, Gomez also offered to take the children after he

became married and offered to let the children stay with his sister. Bechtold then contacted an adoption agency in California, but was unable to place the children with that agency because Gomez again refused consent to an adoption.

In October 1991, Bechtold contacted the K.E.S.I.L. adoption agency. Knowing she needed Gomez' consent, Bechtold lied to K.E.S.I.L. and stated that she did not know the identity of the children's father(s). Bechtold placed Kassandra and Nicholas in K.E.S.I.L.'s custody on October 19, 1991. On November 2, 1991, Bechtold signed relinquishment forms for each child. The relinquishment forms stated that Bechtold granted K.E.S.I.L. full power in its discretion to take the children, care for the children, and place the children in a suitable family home for adoption. The relinquishments further authorized K.E.S.I.L. to take all necessary steps to effect the legal adoption of the children. K.E.S.I.L. accepted responsibility for the children on the same forms. Along with the relinquishment forms, Bechtold signed an affidavit stating in part that she had full knowledge and understanding as to the nature of the proceedings and that she fully realized that she would lose all legal rights in the children as soon as K.E.S.I.L. accepted her written relinquishment, at which time her consent would become irrevocable.

On the same day Bechtold signed the relinquishment forms, Kassandra and Nicholas were placed with the Savages. The Savages signed a "Child Acceptance Agreement," in which they acknowledged that K.E.S.I.L. had advised them that "until finalization in Nebraska Courts, this adoptive placement is one they term 'legal risk' [sic] because the birth fathers of the children have not been named, identified on the child's birth records or signed a relinquishment of parental rights." The agreement also stated that if for any reason the adoptive parents were not able to continue with placement, the children would return to K.E.S.I.L.'s custody.

Bechtold contends that she specifically chose the Savages as adoptive parents for Kassandra and Nicholas. The record contains a letter on behalf of K.E.S.I.L.'s predecessor, Adoption Links Worldwide, disclaiming any interest in, or responsibility for, the children. The letter also states that the agency's records reflect, and it has been represented to them, that the placement

was not made with K.E.S.I.L., but was an "identified placement" under which the children were placed with a couple specifically chosen by Bechtold. However, other than this letter and Bechtold's statements to this fact, the record has no details on how Bechtold chose the Savages or if information regarding other adoptive parents was provided to her.

Gomez learned in November 1991 that the two children had been placed for adoption when he telephoned Bechtold to discuss the children's attendance at his upcoming wedding. Bechtold told Gomez that she had placed the children for adoption but refused to give him any further information. Gomez called various adoption agencies listed in the phone book, but was unable to locate the children. In November 1991, Gomez filed two "Notice of Intent to Claim Paternity" forms with the Department of Social Services.

On October 20, 1992, the Savages filed a petition for adoption in the county court for Cass County. Gomez contested the adoption proceedings. The county court in the adoption proceedings determined that Gomez was unfit and that his parental rights should be terminated in order for the adoption to continue. The decision of the county court was appealed to the Nebraska Court of Appeals. See *In re Adoption of Kassandra B. & Nicholas B.*, 3 Neb. App. 180, 524 N.W.2d 821 (1994). This court granted further review and on December 8, 1995, concluded that due to Gomez' lack of consent, the district court lacked jurisdiction to hear the adoption proceedings. Accordingly, we remanded the cause with directions to dismiss. See *In re Adoption of Kassandra B. & Nicholas B.*, 248 Neb. 912, 540 N.W.2d 554 (1995).

### REVOCATION OF RELINQUISHMENTS

On December 15, 1995, Bechtold gave notice to the Savages that she revoked the relinquishments she gave to K.E.S.I.L. in November 1991. At this time, K.E.S.I.L. was no longer licensed in Nebraska as an adoption agency. The parties stipulated that the children could still legally be put up for adoption by an agency after the agency's license had expired. The Savages consented to Bechtold's actions in revoking the relinquishments. Next, Bechtold gave the Savages a power of attorney effective

for both Kassandra and Nicholas, and the children continued to reside with the Savages. Gomez then filed the instant action, seeking a writ of habeas corpus in order to regain custody of his children. Following the filing of Gomez' petition, the Savages filed a new adoption proceeding under the new adoption laws appearing at Neb. Rev. Stat. § 43-104.01 et seq. (Supp. 1995). Bechtold has intervened in the instant case.

## TRIAL PROCEEDINGS

Trial was held on December 20, 1996, and February 4 and 7, 1997. Four days prior to the December trial date, Gomez was charged with assault and battery, disorderly conduct, and possession of a controlled substance, due to his involvement in a fight outside of a bar in Council Bluffs, Iowa. The record further lists 23 previous contacts with law enforcement. Gomez has been convicted of shoplifting, giving false information, trespassing, failure to appear, obstruction of justice, destruction of property, fraudulent obtaining of benefits, fraud by receipt of unemployment benefits, and no valid registration. Gomez has also been convicted three times for driving under the influence of intoxicating liquor (DUI). Gomez was convicted of a third-offense DUI during the period of time of the trial proceedings and was sentenced to serve a jail sentence of 30 days in February 1997. As a result of his DUI convictions, Gomez' driver's license has been revoked in Iowa for a period of 6 years. During 1996, Gomez was in jail four times.

At the commencement of trial, Gomez testified that he had just become employed with a roofing company and that by the time of the February trial date, he had received a raise, made arrangements to catch up on missed child support payments, and made arrangements to have child support payments taken directly from his wages. Also by the time of the February trial date, Gomez stated that he had arranged for housing assistance, rented furniture, and moved into a four-bedroom house with his wife and family. Gomez testified that he realized he had a problem with alcohol and that many of his problems were due to the stress of losing his children. Gomez further testified that he had stopped drinking, joined Alcoholics Anonymous, and realized that it was time he grew up and assumed a normal life.

Testimony at trial revealed that Gomez assaulted his wife in front of his stepchildren in 1994. Gomez admitted that he had been drinking and that the children became very upset as a result of the assault. Gomez' conviction for obstruction of justice and destruction of property resulted from an incident in which Gomez kicked out a door at the Omaha Police Division after he had been drinking. Bechtold testified that she had seen Gomez selling drugs in 1996. Bechtold further testified that Gomez attended a birthday party for Jamie during which he smoked marijuana and appeared to be intoxicated. Gomez admitted that he had previously kept drugs in the house while the children were there. However, Gomez stated that he did not smoke marijuana in front of the children and that he has not used marijuana since 1993.

The record indicates that Gomez has had trouble remaining employed and has a history of unemployment. Between July and December 20, 1996, Gomez earned only $500 to $1,000. He does not keep a checking or savings account. Gomez does not have any physical or mental disabilities that prevent him from being employed. He is delinquent by approximately $500 in the payment of child support for Jamie. Bechtold testified that Gomez rarely sees or calls Jamie, but Gomez testified that he speaks to Jamie often and that they have not spent much time together because she has been busy with her teenage friends. Gomez also testified that he was behind in child support payments because of his unemployment and that he has made up payment deficiencies before. Gomez further testified that jail time interfered with his ability to retain employment.

Joseph L. Rizzo, Ph.D., a clinical psychologist, testified on behalf of the Savages. Rizzo made an assessment of Gomez and testified on his behalf in the original adoption proceedings in 1993. The record shows that Rizzo had reevaluated his opinion regarding Gomez' fitness as a parent. Gomez moved that Rizzo be disqualified as a witness because work product and privileged information had been shared with the Savages' attorney, causing prejudice to Gomez. The district court overruled Gomez' motion.

Other testimony indicated that Gomez was able to visit his children in 1993 under court-ordered visitation. According to

Gomez and the children's guardian ad litem at that time, the visitation went fine, the children were comfortable with Gomez and happy to see him, and Kassandra recognized Gomez. However, Karen Savage testified that the children were upset following Gomez' visits and had to sleep with night lights afterward. Gomez last saw his children in 1993. The record shows that the children have bonded with the Savages and refer to the Savages as their parents. Gomez has conceded that if he is found to be unfit to have custody, it is in the best interests of the children that they remain in the custody of the Savages. Bechtold testified that if the Savages are unable to adopt the children, then she wants them back.

### DISTRICT COURT'S DETERMINATION

Pointing to Gomez' history of unemployment, alcohol abuse, contacts with law enforcement, and lack of parental support, the district court determined that Gomez was unfit to act as a parent to Kassandra and Nicholas. The district court determined that the revocation of Bechtold's relinquishment of her parental rights was valid and that Bechtold had authority to issue a power of attorney to the Savages. The district court further questioned whether Gomez had standing to challenge the revocations. The district court then determined that under the power of attorney executed by Bechtold, the Savages had lawful custody of the children, and that the evidence supported the conclusion that it would be in the best interests of the children if they remained with the Savages.

### ASSIGNMENTS OF ERROR

Gomez assigns that the district court erred in (1) determining that Bechtold could revoke her relinquishments of her parental rights, (2) allowing Rizzo to testify on behalf of the Savages, and (3) determining that Gomez was unfit to have custody of his children.

### STANDARD OF REVIEW

Both parties have asserted that in an appeal from a decision in a habeas corpus action involving custody of a child, an appellate court's review of a trial court's judgment is de novo on the record to determine whether there has been an abuse of discre-

tion by the trial judge, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366 (1992).

However, this standard derives from *Reynolds v. Green*, 232 Neb. 60, 439 N.W.2d 486 (1989), which erroneously imported the abuse of discretion standard applicable in dissolution of marriage cases into a habeas corpus action. To the extent *Reynolds* erroneously set out the standard of review, it is overruled.

Under the correct standard of review, a decision in a habeas corpus case involving the custody of a child is reviewed by an appellate court de novo on the record, and in that de novo review, where the evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. See, e.g., *Hohndorf v. Watson*, 240 Neb. 368, 482 N.W.2d 241 (1992); *L.G.P. v. Nebraska Dept. of Soc. Servs.*, 239 Neb. 644, 477 N.W.2d 571 (1991); *Yopp v. Batt*, 237 Neb. 779, 467 N.W.2d 868 (1991); *Hensman v. Parsons*, 235 Neb. 872, 458 N.W.2d 199 (1990).

When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Brams Ltd. v. Elf Enters.*, 253 Neb. 932, 573 N.W.2d 139 (1998); *Mandolfo v. Chudy*, 253 Neb. 927, 573 N.W.2d 135 (1998).

## ANALYSIS

### BECHTOLD'S REVOCATION OF
### RELINQUISHMENTS OF PARENTAL RIGHTS

Gomez argues that Bechtold's revocations were invalid because the adoption was an agency adoption under which Bechtold's relinquishments became irrevocable when the agency accepted responsibility for the children. However, Bechtold and the Savages argue that the revocations were valid. Because the underlying adoption was not able to be carried out,

Bechtold contends that a revocation of her consent to that adoption is appropriate. Bechtold further asserts that the adoption was a private adoption because she specifically chose the Savages as adoptive parents and that in a private adoption, the relinquishing parent does not lose all parental rights until a decree of adoption has been entered. Bechtold states that if the Savages cannot adopt the children, then she wants to regain custody of them.

The Legislature, as well as this court, has long recognized a distinction between agency adoptions and private adoptions. In the case of an agency adoption, the relinquishing parent surrenders all rights to the child in favor of the state or a licensed child placement agency. *Yopp v. Batt, supra.* This court has treated an adoption as an agency adoption when a natural parent personally chose the adoptive parents with the help of an agency. See *Kellie v. Lutheran Family & Social Service,* 208 Neb. 767, 305 N.W.2d 874 (1981). Neb. Rev. Stat. § 43-106.01 (Reissue 1993) states:

> When a child shall have been relinquished by written instrument . . . to the Department of Social Services or to a licensed child placement agency and the agency has, in writing, accepted full responsibility for the child, the person so relinquishing shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such child.

Under § 43-106.01, the rights of the relinquishing parent are terminated when the agency accepts responsibility for the child in writing. It is the agency that finds and investigates the prospective parents. If the adoptive parents are unsuitable or decline to go through with the adoption, the agency retains custody over the child until such time as the child is adopted by another family. *Yopp v. Batt, supra.*

In the case of a private adoption, the child is relinquished directly into the hands of the prospective adoptive parents without interference by the state or a private agency. *Id.* Neb. Rev. Stat. § 43-111 (Reissue 1993) states: "Except as provided in section 43-106.01 . . . after a decree of adoption has been entered, the natural parents of the adopted child shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such adopted child . . . ."

Under § 43-111, the relinquishing parent's rights are not totally extinguished until the child has been formally adopted by the prospective parents. *Yopp v. Batt, supra.*

This court has recognized that issues regarding the relinquishment of parental rights are particularly troublesome when the relinquishing parent wants the child returned. *Id.* Thus, this court has held that a relinquishment, given voluntarily, is not revocable. In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights and consent to adoption signed by a natural parent knowingly, intelligently, and voluntarily is valid. *Gaughan v. Gilliam,* 224 Neb. 836, 401 N.W.2d 687 (1987).

Bechtold asserts that the adoption was a private adoption because she specifically chose the Savages as adoptive parents. However, the relinquishments and affidavit signed by Bechtold make clear that she relinquished the children to the K.E.S.I.L. agency and not directly to the Savages. The relinquishments further show K.E.S.I.L.'s acceptance of responsibility for the children. The agreement signed by the Savages indicates that if the adoption were to fail, the children would be returned to the agency. Neither Bechtold nor the agency has provided sufficient facts to show that the instant case is distinguishable from *Kellie*, where a natural parent chose and identified the adoptive parents with the assistance of an agency. Accordingly, the instant case involves an agency, rather than a private, adoption.

Because the instant case involves an agency adoption, Bechtold's parental rights were terminated on November 2, 1991, when the agency accepted responsibility for the children. Bechtold does not contend that the original relinquishments were given due to coercion, fraud, or duress. Bechtold's relinquishments were voluntarily given and were irrevocable. Thus, Bechtold's subsequent attempts to revoke her relinquishments were not valid, and Bechtold does not have any present rights to custody of the children based on her status as their natural mother.

## Rizzo's Testimony

Gomez contends that the district court erred in allowing Rizzo to testify because Rizzo had information regarding work

product of Gomez' former attorney that may have been communicated to the Savages' attorney.

Because of this court's de novo review, the trial court's consideration of improper evidence would not, by itself, require reversal. Rather, this court tries factual questions de novo on the record and does not consider any impermissible or improper evidence. See *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991).

Assuming arguendo that Gomez is correct and Rizzo's testimony was impermissible, an issue we do not have to address, we will consider the issue of Gomez' fitness as a parent without considering Rizzo's testimony.

## GOMEZ' FITNESS

Gomez contends that the district court erred in determining that he was unfit and argues that as a biological parent, he has rights superior to the Savages regarding the custody of his children unless the Savages affirmatively show by clear and convincing evidence that he is not a fit parent. In particular, Gomez argues that the district court applied the wrong standard in determining that he failed to provide support for his children and improperly considered his financial status. Gomez further contends that the court failed to recognize that the children were not present or directly affected by his past encounters with law enforcement and use of alcohol. Before proceeding further, we set forth some general principles of law which are helpful to the resolution of the issue of fitness.

Where the custody of a minor child is involved in a habeas corpus action, the custody of the child is to be determined by the best interests of the child, with due regard for the superior rights of a fit, proper, and suitable parent. *Uhing v. Uhing*, 241 Neb. 368, 488 N.W.2d 366 (1992); *Nielsen v. Nielsen*, 207 Neb. 141, 296 N.W.2d 483 (1980).

A court may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right. *Uhing v. Uhing, supra*; *Nielsen v. Nielsen, supra*.

The right of a parent to the custody of a minor child is not lightly to be set aside in favor of more distant relatives or unrelated parties, and a court may not deprive a parent of such custody unless he or she is shown to be unfit or to have forfeited his or her superior right to such custody. *Uhing v. Uhing, supra; Nielsen v. Nielsen, supra.*

Parental unfitness has been defined as "'a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.'" *Uhing v. Uhing,* 241 Neb. at 375, 488 N.W.2d at 372. However, this court has also stated that

> [i]f the evidence of unfitness is insufficient to justify termination of parental rights in an action maintained under the Nebraska Juvenile Code, similarly deficient evidence of parental unfitness in a habeas corpus proceeding prevents a court from granting child custody to one who is a stranger to the parent-child relationship.

*Uhing v. Uhing,* 241 Neb. at 377, 488 N.W.2d at 373. See, also, *Marcus v. Huffman,* 187 Neb. 798, 194 N.W.2d 221 (1972). This rule is based on the premise that if the state would not be justified in taking custody of a child, certainly a stranger should stand in no better position. *Marcus v. Huffman, supra.*

Neb. Rev. Stat. § 43-292 (Cum. Supp. 1996) of the Nebraska Juvenile Code provides in part:

> The court may terminate all parental rights between the parents or the mother of a juvenile born out of wedlock and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> (1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition;
>
> (2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection;
>
> (3) The parents, being financially able, have willfully neglected to provide the juvenile with the necessary subsistence, education, or other care necessary for his or her

health, morals, or welfare or have neglected to pay for such subsistence, education, or other care when legal custody of the juvenile is lodged with others and such payment ordered by the court;

(4) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile[.]

An order terminating parental rights must be based upon clear and convincing evidence. *In re Interest of B.A.G.*, 235 Neb. 730, 457 N.W.2d 292 (1990); *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985).

Gomez is correct in stating that the court cannot deny him custody based on the fact that he has limited resources. A court cannot deprive a parent of the custody of a child merely because the parent has limited resources or financial problems, or because the parent's lifestyle is different or unusual. *State v. Worrell*, 198 Neb. 507, 253 N.W.2d 843 (1977). The fact that a person outside the immediate family relationship may be able to provide greater or better financial care or assistance for a child than can a parent is an insufficient basis to deprive a parent of the right to child custody. *Uhing v. Uhing, supra.*

However, in the instant case, the record indicates that Gomez chose to withhold the resources he had from his children and failed to make reasonable attempts to acquire steady employment. As the district court noted, in 1996, Gomez had five different employers. Although he has provided some support for his children, the record is clear that the amounts were nominal and irregular. At one point, Gomez abandoned his children and moved to Kansas, denying his children anything in support during that time. Although he may have been behind on his child support payments for Jamie due to his lack of financial resources, the record also indicates that during his periods of unemployment, Gomez was either physically able to work and chose not to, or was unable to work because of incarceration. Gomez had control over whether he generated income and remained out of jail in order to provide child support for Jamie. Although a support order was never entered that required

Gomez to provide child support for Nicholas and Kassandra, a court can determine that a parent has failed to fulfill parental responsibilities of support and maintenance when no orders for support have been entered. See *In re Interest of Wagner and Russell*, 209 Neb. 33, 305 N.W.2d 900 (1981).

Also of concern is Gomez' criminal history, alcohol use, and drug use. Gomez has been convicted of DUI three times and has had his driver's license suspended for 6 years. He was also arrested for assaulting his wife in front of his stepchildren while under the influence of alcohol. Although Gomez stated that he has stopped drinking and joined Alcoholics Anonymous, this was apparently done at the last minute, sometime between the two trial dates, and he gave no evidence to prove his attendance at Alcoholics Anonymous meetings.

Gomez argues that under § 43-292(4), his alcohol abuse must be shown by clear and convincing evidence to be "seriously detrimental to the health, morals or well-being of the juvenile." Brief for appellant at 26. Gomez further states that in *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991), this court held that alcohol abuse must rise to the level of serious neglect of the child in question before parental rights can be terminated. However, although *In re Interest of A.H.* involved serious alcohol abuse, this court made no such statement in that case.

The fact that Nicholas and Kassandra were not present while Gomez was drinking or was involved in criminal activity makes little difference. One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2), and the State is not required to show harm to the children before parental rights can be terminated. *In re Interest of J.N.V.*, 224 Neb. 108, 395 N.W.2d 758 (1986); *In re Interest of S.P., N.P., and L.P.*, 221 Neb. 165, 375 N.W.2d 616 (1985). Further, a parent's moral conduct is a valid consideration in a determination of parental fitness. *In re Interest of Reed*, 212 Neb. 208, 322 N.W.2d 411 (1982).

The fact that Gomez claims that he made some last minute improvements does little in light of his past behavior to show that he is now capable of fulfilling his duties as a parent. In the instant case, the record clearly shows that Gomez has an exten-

sive criminal record, has left his children in the past without providing support, has difficulty in maintaining employment or refuses to maintain employment, and has difficulties involving alcohol and drug use. The cumulative effect of Gomez' behavior provides clear and convincing evidence that he is unfit to have custody of the children.

Having determined that Gomez is unfit, we find from our de novo review that the record clearly shows it is in the best interests of the children to remain in the custody of the Savages. The Savages are fit to have custody of the children. Bechtold does not have any superior rights to custody over either Gomez or the Savages, and the adoption agency has refused responsibility for the children. Thus, there are no other parties this court need be concerned with before allowing custody to remain with the Savages. The record shows that the children have been with the Savages for over 7 years and view the Savages as their family. Furthermore, Gomez conceded that if he were found to be unfit, it was in the best interests of the children that they remain with the Savages. Thus, it is clear that it is in the best interests of the children to remain in the custody of the Savages.

AFFIRMED AS MODIFIED.