IN RE GUARDIANSHIP OF BRENDA B. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
LINDA W., APPELLANT, V. HUGO B.
AND RAYNE B., APPELLEES.

698 N.W.2d 228

Filed June 14, 2005.   No. A-04-617.

Deborah A. Sanwick for appellant.

Jeffrey A. Wagner, of Schirber & Wagner, L.L.P., for appellees.

Thomas K. Harmon, guardian ad litem.

IRWIN, CARLSON, and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

Linda W., formerly known as Linda H., filed an application in the county court for Douglas County, seeking to terminate Hugo B. and Rayne B.'s guardianship of Linda's three biological children. The court denied Linda's application, and Linda appealed. We conclude that the denial of the application to terminate the guardianship was not supported by clear and convincing evidence, and we reverse, and remand with directions.

## BACKGROUND

Linda is the biological mother of Brenda B., born February 8, 1990; Samantha B., born February 27, 1992; and Richard R., born March 17, 1995. Brenda and Samantha's father was deported to Bolivia in approximately October 1999 and is not a party to the present proceedings. Likewise, Richard's father is not a party to these proceedings. We observe that Hugo and Rayne, the children's coguardians, are husband and wife and that Hugo is Brenda and Samantha's paternal uncle.

In approximately July 2000, the juvenile court system acquired jurisdiction over the children and the children were removed from Linda's custody. At the time, Linda was involved with Christopher H., whom she eventually married and has since divorced. The family was reunified in April 2001, but the children were again removed from Linda's care in August 2001. A motion to terminate Linda's parental rights was filed in approximately February 2002. The present guardianship was established in exchange for dismissal of the termination of parental rights proceedings.

Hugo and Rayne filed a petition in the county court on August 30, 2002, seeking appointment as the children's coguardians. Hugo and Rayne alleged that the children were then under the jurisdiction of the separate juvenile court of Douglas County and that the children had been in the principal care and custody of the Nebraska Department of Health and Human Services (the Department) and Hugo and Rayne during the preceding 60 days. Hugo and Rayne alleged that their appointment as the children's coguardians was for the children's welfare and in the children's best interests.

On March 13, 2003, the county court held a hearing and entered an order appointing Hugo and Rayne as the children's coguardians. The March 13 order shows that at the guardianship appointment hearing, Hugo and Rayne were present with their attorney, Linda was present with her attorney, and the children were present. In its order, the court found that venue in Douglas County was proper, that notice had been given as required by law, and that jurisdiction was proper in "this court." The court found that it was in the children's best interests that coguardians be appointed and that Hugo and Rayne were proper and competent

persons to serve as coguardians, since there were no other persons having priority for or interested in such appointment. While there is nothing in the court's March 13 order reflecting Linda's consent to the guardianship or any stipulation of the parties to that effect, Linda stated in her application to terminate the guardianship that she had consented to the appointment of coguardians for her children and her testimony at the hearing on her application is consistent with this assertion. The court did note, in its March 13 order, the parties' agreement that it was in the best interests of the children to maintain contact with Linda and, accordingly, awarded Linda reasonable rights of visitation "as agreed to by the parties." The court found that this visitation might include unsupervised, overnight, and extended visitation when the parties agreed such visitation was in the children's best interests.

On September 5, 2003, Linda filed an application seeking to terminate the guardianship. Linda stated that after she consented to the appointment of Hugo and Rayne as the children's coguardians, the separate juvenile court of Douglas County dismissed the motion to terminate Linda's parental rights. Linda alleged that she had removed herself from the abusive relationship with her husband, Christopher, and had filed a dissolution of marriage action against him. Linda alleged that she was a stable, fit parent and that it was in the children's best interests to have them returned to her care. Linda also stated her belief that the coguardians "would agree to dismiss the guardianship."

On April 20, 2004, the court heard testimony and received evidence on Linda's application. Linda testified that she was divorced from Christopher, which dissolution of marriage was finalized March 22, 2004. Linda had resided alone in a three-bedroom house since October 1, 2003. Linda was working 6:45 a.m. to 2:45 p.m. Monday through Friday and earning $13.12 per hour at a company where she had worked for the previous 6 years. Linda testified that she pays $50 a month in child support for the children, an amount that was ordered "over four years ago."

Regarding visitation, Linda testified that when the guardianship was first established, Hugo and Rayne (hereinafter collectively the Appellees) agreed that Linda could see the children

"whenever [she] wanted to." Linda indicated that she saw the children first weekly and then every other week. The Appellees apparently stopped Linda's visitation with the children near the end of September or first part of October 2003 until approximately December 28. Linda testified that Hugo stopped her visitations because Linda had called Brenda's school to talk to her. Linda called Brenda at school because Linda often got no answer or a busy signal when she called Brenda at the Appellees' residence. Linda also testified that on several occasions, the Appellees had punished the children by not allowing them to have visitation with her, and that since resuming visitation at the end of December 2003, the Appellees had allowed Linda to visit with the children only in the Appellees' home in their presence. According to Linda, the Appellees have never provided her with any reason for supervising her visits.

Linda testified that she saw the children every other weekend in January 2004. Linda received from the Appellees a letter dated February 1, 2004, setting visitation for the last Sunday of each month at noon. The letter states that after discussion with the children, the Appellees determined that the children were comfortable with seeing Linda once every 4 weeks or about once a month. Linda testified that the visits now last approximately 2 hours, that the children "get bored" at the house, that she and the children play games occasionally or she asks them about school, but that "there's just not a lot to do."

Linda testified that Richard's father sexually abused the children "over six years ago" while the family was living in Missouri. Linda testified that she terminated her relationship with Richard's father in March 1998, once she learned of the abuse, and that she has had no contact with him since that time. Linda testified that the children did have some behavioral problems because of this abuse but that she was unaware whether they continued to have problems related to the abuse. Linda later became involved with and eventually married Christopher. When asked if Christopher was abusive to the children, Linda responded, "No." But, given the preceding questions concerning the sexual abuse by Richard's father, which Linda described as "a one-time issue," it is unclear from the record if Linda was denying sexual or physical abuse on the part of Christopher.

The record does show that the children were removed from Linda's home on two occasions. Linda was asked about allegations made in the juvenile proceedings that she disciplined the children by making them eat jalapeno peppers and by putting jalapeno hot sauce on their tongues. Linda testified that Christopher had done this to the children while she was at work and that she did not continue to leave the children in his care after this happened. Linda specifically testified that the children ended up in juvenile court "[b]ecause [the court] had the allegations of that happening," after which time she "had to go to parenting classes." Linda testified that she "got [her] son back five weeks after [the children] were taken the first time." Linda testified that she attended parenting classes as ordered in the juvenile court proceedings and that she learned "[d]ifferent ways of disciplining the children." Linda testified that she attended a special class for children with "ADHD, bipolar, and other learning disabilities which helped [her] a lot."

Linda indicated that the children were removed from her home a second time after Christopher spanked Samantha. Linda denied that there were marks or bruises on Samantha from this spanking. Linda testified that the spanking occurred after she intervened in a fight between Samantha and Richard, which led to Samantha's striking Linda with a belt. Linda testified that she was upstairs taking care of Richard at the time Samantha's spanking occurred. Linda testified that information about Christopher's spanking Samantha "had gotten back to the therapist" and that the children "never made it home that day from school." Linda testified that they "went to court on the ticket that my ex-husband was issued," that "[c]harges had been dropped from that case," and that the juvenile court system "stepped in." Linda indicated that Christopher was not abusive to her "until after [she] started fighting so hard to get the children back," at which point he "became very abusive" toward her. Because of this abuse, Linda filed a protection order against Christopher, had him removed from the house, and filed for divorce.

Linda testified that she was revoking her consent to the guardianship and was asking the court to return the children to her custody. Linda testified that if the children were returned to her care, she would be able to make arrangements for suitable

daycare and she planned to use timeouts and short-term removals of "personal possessions that they adore" as her primary methods of punishment. Linda testified that it "ha[d] not been [her] way" to physically abuse the children. Linda testified that she would be agreeable to Brenda's remaining with the Appellees if Brenda chose to do so and that she would not "force" Brenda to do something, because that would damage their mother-daughter relationship. Linda testified that based on "what we've talked [about] in the past" (apparently referring to conversations she had had with the children before the Appellees imposed more restrictive visitation arrangements), it would be in the children's best interests to live with her. Linda indicated, however, that she was not certain how the children felt about her, due to her restricted contact with them under the new visitation arrangements.

During the course of Linda's testimony, the court took judicial notice of "all matters contained within the file under the juvenile court file [in the previous proceeding that initiated the guardianship case]." However, no portion of such juvenile court file was admitted into evidence.

The court appointed Thomas Harmon as the children's substitute guardian ad litem in January 2004. Following Harmon's appointment, he visited with the Appellees, Brenda, and Linda and reviewed the "rather extensive report" prepared by his predecessor as guardian ad litem. The report of Harmon's predecessor is not included in the record before us. Harmon did not visit Linda's home but had three visits with her in his office. Harmon testified that during those visits, Linda appeared very articulate in her position, identified issues she wished him to be aware of, and identified concerns with respect to each of the children. Harmon testified that Linda had informed him that she lived in a three-bedroom home where each child could have a room of his or her own. Linda advised Harmon that the Appellees had punished the children by canceling visits with Linda. Harmon did not ask the Appellees about this allegation. Harmon reported that with respect to school, Linda's children were "like all children"—they were doing well in some subjects and not necessarily so well in other subjects. Harmon did not find anything unusual about the children's behavior noted in their school records.

The court overruled Linda's objections to Harmon's opinion testimony regarding termination of the guardianship and allowed Harmon to testify that "there is no legal basis that [he could] see at this juncture to terminate the guardianship." The court overruled further objections by Linda and allowed Harmon to testify that it was in the children's best interests "at this stage" to remain with the Appellees and that he had seen nothing "from an objective standpoint" to indicate that the guardianship was no longer appropriate. Harmon also testified that Brenda had indicated to him that she did not wish to return to Linda's home "at this point in time."

A friend of Linda testified on Linda's behalf. The friend had last seen Linda together with the children approximately 2 to 2½ years before the hearing. At that time, the friend "didn't see anything wrong with [Linda's] parenting." The friend had occasion to visit Linda's home at the time and observed the home to be cluttered but clean. The friend had trusted Linda to babysit the friend's children on occasion.

Sherry Elliott became acquainted with Linda through Linda's involvement in the juvenile court system. Elliott was Linda's family support worker for 2 years, provided one-on-one advice on parenting techniques, transported the children to Linda's home for visits, and supervised those visits with Linda. Linda's one-on-one sessions with Elliott occurred once a week for 3 hours, and the visitations occurred three times per week for 4 hours. Elliott testified that Linda responded positively to the information learned during one-on-one sessions and that Linda appropriately applied during visitation sessions the parenting techniques she was being taught. Elliott described Linda's interactions with the children during visitations as "very good" and testified that she saw nothing in Linda's behavior that "alarmed" her. Elliott's last involvement with Linda and the children was prior to the commencement of the guardianship.

Kelli Mitchell, a child protection and safety worker with the Department at the time of Linda's involvement with the juvenile court system, assumed case management of Linda's case on February 14, 2001. Mitchell testified that the juvenile case was adjudicated initially in approximately July 2000 for inappropriate discipline, Linda's failure to obtain therapy or keep mental

health appointments for the children in relation to the sexual molestation, and Linda's failure to see the "severity in the children's need for mental health appointments." The children were apparently removed from Linda's home at some point in 2000, but the timing of this first removal and the children's placement following that removal are not clear from the record. Given certain testimony from Hugo, however, it is likely that the children were placed in foster care with the Appellees.

While reunification occurred in April 2001, the children were removed from Linda's care a second time in August 2001. Again, the children's placement is not clear without reference to the juvenile court record, but given certain testimony from Hugo, it is likely that the children were placed with the Appellees upon the children's second removal from Linda's care. Mitchell testified that after the children were removed a second time, she observed "marks and bruises" on Samantha. Mitchell testified Linda ultimately admitted before the juvenile court that Samantha sustained the bruises because Christopher hit her with a plastic ruler and that Linda had failed to protect the children from this abuse. Mitchell testified that after August 2001, she had concerns with Linda's parenting. Specifically, Mitchell had concerns with, among other things, Linda's disputing "allegations that were adjudicated" and Linda's need to be "redirected" at times during visits. Mitchell testified that Linda "[s]ometimes" took responsibility for previously adjudicated allegations and "[s]ometimes" recognized her shortcomings in parenting. Mitchell testified that she was concerned by the "great minimization" on Linda's part. Mitchell was present during therapy sessions "at times" and attended three or four visitations over the course of 2 years.

Mitchell testified that the State of Nebraska filed a motion to terminate Linda's parental rights in February 2002. At that time, Mitchell discussed with Linda the possibility of a guardianship. Mitchell felt that a guardianship would be in the children's best interests and would provide the children with "permanency." Mitchell informed Linda that termination of her parental rights was a possibility if she did not agree to the guardianship.

The Appellees reside together with their own two biological children and Linda's three children. Hugo testified that Linda's

children have resided with the Appellees "[o]ff and on" for about 4 years and consistently for about 3 years prior to the hearing. Hugo testified that Linda had visitations with the children prior to the guardianship and that the Appellees allowed the visitations to continue after they were appointed as coguardians for the children. Hugo testified that Linda would take the children home with her for "a few hours at a time on the weekends." Hugo testified that after visits with Linda, the Appellees observed that the children would "start acting up," be unresponsive, not talk, be mad, or be upset. The Appellees spoke with the children and then discussed certain concerns with Linda. Hugo stated that Linda was dating a man from her workplace after Christopher "left the picture" and that Hugo asked Linda not to let this man have contact with the children. Hugo testified that Linda agreed to his request but that she allowed this man to be present during a couple of visits and instructed the children each time not to tell the Appellees. Hugo testified that he was concerned about this man because of issues arising out of some of Linda's previous relationships. Hugo testified that the Appellees stopped Linda's visits with her children for a period during the fall of 2003 "due to the lies and telling the children to lie." Hugo testified that after discussing this concern with Linda, she "was angry and continued to lie about it." Hugo testified that he thought it was in the children's best interests at that time to stop the visits. Hugo testified that at some point, the Appellees spoke with the children and agreed to restrict visits to once a month in the Appellees' home. Hugo testified that he believed the present visitation schedule was in the children's best interests. Hugo stated that he no longer really noticed the same behavioral problems previously observed in the children after visits with Linda. Hugo requested to continue to serve as the children's coguardian and testified that it would be in the children's best interests for him to continue in this capacity.

On cross-examination, Hugo testified that the children had been undergoing therapy until about a month before the hearing. Hugo indicated the children's therapy was stopped because the children were not "getting [any]thing out of it." The Appellees receive $500 per month in Social Security benefits for Richard and $1,200 or $1,300 in benefits from the State for

the three children. Hugo admitted that the Appellees have punished the children for "[p]robably continuous behavior" by not allowing them to have visitation with Linda. Hugo testified that he did not have any specific concerns about the man Linda was currently involved with but that he was simply concerned about Linda "bringing a new man into her life and trying to make the children a part of it."

On April 21, 2003, the court entered an order denying Linda's application to terminate the guardianship. The court determined, upon considering the evidence and the applicable law, that Linda's application "[wa]s, in all things, denied." The court also found that the Appellees should continue to serve as legal guardians for the children. Linda subsequently perfected her appeal to this court.

## ASSIGNMENTS OF ERROR

Linda asserts, consolidated and restated, that the court erred in (1) denying her application to terminate the guardianship without an affirmative showing that she was unfit as a parent or had forfeited her parental rights, (2) allowing opinion testimony of the guardian ad litem, and (3) summarily dismissing her application without making any findings of fact or conclusions of law.

## STANDARD OF REVIEW

Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 1995 & Cum. Supp. 2004), are reviewed for error on the record. *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

## ANALYSIS

*Jurisdiction.*

Before addressing the merits of this appeal, we deem it necessary to first comment on the procedural background of this case as it relates to the jurisdiction of the county court over the guardianship proceeding. The allegations in the guardianship petition and the motion to terminate the guardianship, as well as

the testimony presented at the hearing on the motion to terminate the guardianship, all indicate that the children herein had previously been adjudicated in the separate juvenile court. There is no indication that the juvenile court had discharged the children from its jurisdiction; however, the exact status of the juvenile court proceeding is not clear from this record. At this juncture, we note that at the hearing on the motion to terminate the guardianship, the court took "judicial notice" of the entire juvenile court record. However, none of that record was placed into evidence in the present case, a fact that complicates our review of this appeal unnecessarily. In the past, this court has noted the confusion in appellate review caused by the county court, sitting as a probate court, taking judicial notice of a body of proceedings from a juvenile case, "the breadth of which is unknowable on appeal and which technique has been criticized, especially in juvenile cases." See *In re Interest of Justin C. et al.*, 7 Neb. App. 251, 261, 581 N.W.2d 437, 443 (1998). The Nebraska Supreme Court has held:

> "Papers requested to be noticed must be marked, identified, and made a part of the record. Testimony must be transcribed, properly certified, marked and made a part of the record. Trial court's ruling . . . should state and describe what it is the court is judicially noticing. Otherwise, a meaningful review is impossible."

*In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 709, 484 N.W.2d 68, 73 (1992), quoting *In re Interest of Adkins*, 298 N.W.2d 273 (Iowa 1980).

The guardianship petition was filed in the county court and docketed in the probate division. The order establishing the guardianship was signed by a separate juvenile court judge. The bill of exceptions from the hearing on the motion to terminate the guardianship contains reference to the hearing being heard in the separate juvenile court before the juvenile court judge. However, the juvenile court judge, in his opening remarks, states that the matter is denoted as being in the county court, under the probate division case number, and that "[t]his Court enjoys continuing jurisdiction over this matter pursuant to its earlier jurisdiction over this family and these children in [the previous juvenile court proceeding that initiated the guardianship case]." The

order denying Linda's motion to terminate the guardianship is signed by the separate juvenile court judge.

Neb. Rev. Stat. § 43-247(10) (Cum. Supp. 2002), the version in effect at the time the various petitions were filed, provided that the juvenile court has concurrent original jurisdiction with the county court over guardianship proceedings for a child over which the juvenile court already has jurisdiction. Neb. Rev. Stat. § 30-2608(e) (Cum. Supp. 2004) provides in part:

> The petition and all other court filings for a guardianship proceeding shall be filed with the clerk of the county court. The party shall state in the petition whether such party requests that the proceeding be heard by the county court or, in cases in which a separate juvenile court already has jurisdiction over the child in need of a guardian under the Nebraska Juvenile Code, such separate juvenile court. Such proceeding is considered a county court proceeding even if heard by a separate juvenile court judge and an order of the separate juvenile court in such guardianship proceeding has the force and effect of a county court order.

We conclude that under the foregoing statutes, the guardianship proceeding was properly docketed in the county court and heard by a separate juvenile court judge. Since this guardianship is considered a county court proceeding, we review the order appealed from pursuant to the standard set forth above for matters arising under the Nebraska Probate Code.

*Denial of Application to Terminate Guardianship.*

Linda asserts that the court erred in denying her application to terminate the guardianship without an affirmative showing that she was unfit as a parent or had forfeited her parental rights. Linda argues that the Appellees did not meet their burden of proving by clear and convincing evidence that she was unfit or had forfeited her parental rights.

The Nebraska Supreme Court has recently discussed the standards governing termination of guardianships in *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). At the time that D.J.'s natural parents' marriage was being dissolved, they instituted guardianship proceedings and nominated D.J.'s maternal grandparents as his guardians. The grandparents

served as guardians for approximately 3 years, at which time the natural mother filed a petition to remove the grandparents as guardians and terminate the guardianship pursuant to Neb. Rev. Stat. § 30-2616 (Reissue 1995), which petition was denied by the county court. In reversing the county court's decision, the Supreme Court concluded that in guardianship termination proceedings involving a biological or adoptive parent, the parental preference principle serves to establish a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent. *In re Guardianship of D.J., supra.*

■ In reaching this conclusion, the Supreme Court discussed the two competing principles found in child custody jurisprudence. First, the court noted that the paramount concern in child custody disputes is the best interests of the child. *In re Guardianship of D.J., supra.* See *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002). See, also, § 30-2616(a) ("[a]ny person interested in the welfare of a ward . . . may petition for removal of a guardian on the ground that removal would be in the best interest of the ward"). The court also noted that under the principle of parental preference, a court may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right. *In re Guardianship of D.J., supra.* See, also, § 30-2608(a) ("father and mother are the natural guardians of their minor children and are duly entitled to their custody . . . being themselves competent to transact their own business and not otherwise unsuitable").

■ In determining that a parent's superior right to custody should be taken into account during guardianship termination proceedings, the Supreme Court recognized that a guardianship is no more than a temporary custody arrangement established for the well-being of a child. *In re Guardianship of D.J., supra.* The Supreme Court also recognized that the appointment of a guardian is not a de facto termination of parental rights, which results in a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *Id.* Rather, the court stated that "guardianships give parents an opportunity to temporarily relieve themselves of the burdens involved in raising

a child, thereby enabling parents to take those steps necessary to better their situation so they can resume custody of their child in the future." *Id.* at 248, 682 N.W.2d at 246. The court concluded that an individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent either is unfit or has forfeited his or her right to custody. Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000). Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent. *In re Guardianship of D.J., supra.*

In the present case, the court denied Linda's application to terminate the guardianship without making a finding either that she was unfit or that she had forfeited her right to custody. Although *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004), did not involve a minor previously adjudicated under the juvenile code, we believe that the dictates of that case are equally applicable in a case where children have previously been adjudicated. Accordingly, we must review the evidence in the present case to determine whether, at the time of the hearing on the motion to terminate the guardianship, it was clearly and convincingly established that Linda either was unfit or had forfeited her right to custody of the children.

Parental rights may be forfeited by substantial, continuous, and repeated neglect of a child and a failure to discharge the duties of parental care and protection. *In re Guardianship of D.J., supra.* We see no competent evidence in the record to support a conclusion that Linda has forfeited her right to custody of the children. To the contrary, Linda has continued to provide some financial support for the benefit of her children and has maintained consistent contact with them to the extent allowed by the Appellees.

We next review the record to determine whether the evidence would support a finding of unfitness. The Nebraska Supreme Court has stated that parental unfitness involves personal deficiency or incapacity which has prevented, or will probably

prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Gomez v. Savage,* 254 Neb. 836, 580 N.W.2d 523 (1998). The "fitness" standard applied in a guardianship appointment under § 30-2608 is analogous to a juvenile court finding that it would be contrary to a juvenile's health, safety, and welfare to return home. See, *In re Guardianship of Rebecca B. et al.,* 260 Neb. 922, 621 N.W.2d 289 (2000); Neb. Rev. Stat. § 43-284 (Reissue 2004).

The record does not contain any previous finding that Linda is unfit. While the Appellees suggested at oral argument that the previous adjudications of the children (which are not contained in the record) equate with a finding of parental unfitness on the part of Linda, we decline to leap to such an inference; nor do we believe that such a position is legally correct. However, we do agree that the juvenile court history is relevant in our determination of whether Linda is presently unfit to regain custody of her children. Since the juvenile court proceedings are not contained in the bill of exceptions, we are left only with the witnesses' testimony concerning the juvenile court proceeding. We have little concrete information about the actual allegations against Linda in the juvenile court and what progress, if any, Linda had made toward resolving those allegations at the time the guardianship was established. From the record before us, it is apparent that prior to the time the guardianship was established in March 2003, the children had not lived continuously in Linda's home since August 2001, and that sufficient concern existed about Linda's parental fitness for the State to have filed a motion seeking to terminate her parental rights. The concerns about Linda's parental fitness appear to have involved her inability to protect the children from physical abuse by Christopher, her inadequate recognition of therapy needed to address the sexual abuse of the children by Richard's father, and her minimization of the severity of the abuse by both individuals. In the March 13, 2003, order establishing the guardianship, the county court made no finding about Linda's fitness, but, rather, the court simply found that it was in the best interests of the children for the Appellees to be appointed coguardians and that the Appellees were proper and competent persons to serve in such capacity. Although the

March 13 order does not so state, the record before us indicates that Linda agreed to the establishment of the guardianship.

The question before us is whether Linda is presently unfit to have custody of her children. To the extent that any alleged parental deficiency at the time the guardianship was established related to Linda's inability or refusal to protect the children specifically from Christopher, Linda has made great strides in overcoming that particular obstacle to reunification with her children. Since March 2003, Linda has dissolved her marriage to Christopher, and at the time of the hearing on her application to terminate the guardianship, Linda lived alone in a three-bedroom house. Linda also has maintained steady employment and appears to have maintained regular contact with her children to the extent allowed by the Appellees.

As to issues relating to Richard's father, the record shows that Linda has not had contact with him since his abuse of the children was discovered. While Linda may not have addressed her children's therapy needs properly in relation to this sexual abuse, the record does indicate that the children began receiving counseling at some point and continued to do so up until about a month prior to the hearing on Linda's application to terminate guardianship. The record shows that the counseling was stopped because the Appellees and the children felt that the children were no longer benefiting from the counseling. The record does little to reveal whether this was an appropriate decision, but we cannot fault Linda for a decision that was not under her control.

Hugo expressed concerns about Linda's exposing the children to a man she was dating at some point after ending her relationship with Christopher. The record is not clear as to whether Linda's relationship with this man continued at the time of the hearing, but the record is clear that no affirmative allegations of abuse or inappropriate behavior had been raised against him. Given Linda's past association with abusive individuals, Hugo's caution in exposing the children to yet another man in Linda's life is understandable, although we see nothing in the record about Linda's relationship with this man to imply that Linda should be considered "unfit" to have custody of her children for choosing to associate with him. Linda's introducing this man to her children against the Appellees' wishes and instructing her

children to lie to the Appellees about having met this man are of concern, but, again, these actions do not compel us to find Linda unfit. Finally, our review of the record has left us with a sense that Linda continues to minimize the circumstances that brought her family into the juvenile court system and led to the establishment of the guardianship; however, this minimization is difficult to evaluate with certainty, given our lack of access to the actual juvenile court file.

██ In sum, we conclude in our review that the record does not support a finding of unfitness by competent, clear, and convincing evidence. We are mindful that competent evidence of unfitness may have existed in the juvenile court record which is not before us. On the record before us, the Appellees have not met their burden of proving by clear and convincing evidence that Linda presently suffers from a personal deficiency or incapacity which continues to prevent her performance of reasonable parental obligations in child rearing and which will result in detriment to her children's well-being, or that it would be contrary to the children's welfare to return home. Accordingly, we must reverse the order denying Linda's application to terminate the guardianship. The cause is remanded with directions to terminate the guardianship and to reinstate in Linda the care, custody, and control of her children. Because of our resolution of Linda's first assignment of error, we need not consider Linda's other assigned errors. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *Burke v. McKay*, 268 Neb. 14, 679 N.W.2d 418 (2004).

## CONCLUSION

We reverse the order denying Linda's application to terminate the guardianship and remand the cause with directions to terminate the guardianship and to reinstate in Linda the care, custody, and control of her children.

REVERSED AND REMANDED WITH DIRECTIONS.