PHŒBE ANN MUNSON, APPELLEE, V. THOMAS W. CARTER, APPELLANT.

Contract: COERCION IN MAKING: EQUITY JURISDICTION. Where coercion is not sufficient to amount to duress, but a social or domestic force is exerted on a party which controls the free action of his will, and prevents voluntary action in the making of a contract or execution of deed for real estate, equity may relieve against the same on the ground of undue influence.

APPEAL from Adams county. Heard below before MORRIS, J.

*Dilworth, Smith & Dilworth*, for appellant, cited: *Mehlhop v. Pettibone*, 54 Wis., 652. *Schultz v. Culburtson*, 46 Wis., 313. 49 Id., 122.

*J. B. Cessna*, for appellee, cited: Parsons Contracts, 392. Washburn Real Prop., 261. *Eadie v. Slimmon*, 26 N. Y., 9. *Jordan v. Elliott*, 22 American Law Reg., 190. *Foshay v. Ferguson*, 5 Hill, 154.

MAXWELL, CH. J.

In March, 1884, the plaintiff filed her petition in the district court of Adams county, wherein she alleged that on the 25th of September, 1875, she became the owner of the south-west quarter of section twenty, township five north, range 11 west, in Adams county. That it was purchased with money belonging to her and advanced by her. That on May 23d, 1883, she was compelled to deed the same to defendant and take a life lease from him—she was then 65 years old and in feeble health. She was to have all the personal property on the land except one span of mules and certain blacksmith tools, and to have one-third of the then crops on the land. That defendant has failed and refused to comply with his part of the agreement, and

has removed by force a large part of the personal property and grain on the land. The land was free from incumbrance, and worth $3.500.00. That she was not in debt to defendant in any sum ; that the deed was delivered without any consideration. That when the deed was executed and the life lease accepted, the deed was procured by fraud, force, and superior will and intelligence practiced upon her, with the intention of cheating and defrauding her, by defendant. That she was under no obligation to make said deed, and that it was without consideration. That the acknowledgment was procured from her through coercion, force, and fraud, and was not her voluntary act. Prayer for reconveyance, and that the title be quieted in her.

To this petition the defendant filed his answer, stating : " That in 1873 the plaintiff and her husband, being in feeble health and advanced age, desired to make arrangements for their support in their declining years, did enter into a contract with defendant by which it was agreed that defendant should take care of and support the plaintiff and her husband ; that in consideration thereof the plaintiff advanced $1,500.00 to purchase the land in question, and defendant did purchase the land, caused it to be deeded to plaintiff, and plaintiff then agreed with defendant that in consideration of his taking care of and maintaining plaintiff and her husband, and of taking care of the land and improving the real estate, that the said land and all other property which the plaintiff then owned and held, together with the increase of personal property, should go to and belong to the defendant.

" That in pursuance of said contract the defendant entered upon and took care of said real estate and personal property and continued to do so up to May 23d, 1883 ; that from the time of making said contract up to the 19th day of July, 1882, the said Charles Carter, the plaintiff's husband, lived with defendant, and died on said 19th day of July, 1882, and that from the time of making said contract to the time

of his death he was unable, from bodily infirmity, to do anything towards the support of himself and the plaintiff.

"That from the time of making said contract to the death of said Charles Carter defendant took care of and supported the plaintiff and her husband, and after the death of the said Charles the said defendant continued to support plaintiff, as he had agreed to, up to May 23d, 1883.

"That since the making of said contract defendant has employed all his time and spent his money and labor in improving the land and in the support of plaintiff and her husband, and during said time has placed valuable and lasting improvements upon said premises to the value of $1.200.00, and has paid off a mortgage upon the premises to the amount of $400.00, and has paid out for plaintiff and her husband for their support and expenses, under said contract, about $1.600.00, all paid out by defendant under said contract.

"That all the earnings and labor of defendant for eight (8) or nine (9) years had been expended in support of plaintiff and her husband and in making valuable and lasting improvements on said land. For a second defense the defendant alleges that the plaintiff, desiring to re-marry, and not to have defendant support her any longer, and desirous of settling with and remunerating defendant for the labor done upon the land and taking care of and support of her and her husband, she did agree with this defendant to execute and deliver to him a deed for said premises, and the defendant executed to her a life lease on the same premises.

"That on May 23d, 1883, the said plaintiff, in accordance with said settlement, did, of her own free will and accord, execute and deliver to defendant a deed to said premises, and defendant executed and delivered to plaintiff a life lease of said premises, the consideration of said deed being the matters and things heretofore set forth, and a full settlement of all matters and claims and demands

between defendant and plaintiff; that a full and complete settlement of all matters and controversies was made between plaintiff and defendant upon May 23d, 1883.

" That about May 23d, 1883, plaintiff was married; and answer denies all allegations contained in the petition not admitted or denied."

The reply is a general denial.

The plaintiff, in her testimony, after stating that the land in question was purchased and paid for with her money and that she had lived with her son for several years, testifies as follows:

" He had no property except what he raised on that farm. He would haul off the hogs and grain and he kept the money, and what I ate and drank was furnished me, and that was about all I did have. My husband died July 19th, 1882, of a cancer; there was not to exceed $5.00 spent for him; I took care of him night and day; would get up to lift him, and my son did not; I had to take care of him and change him; he would never lift him and tend him. In the winter Mr. Carter had a pre-emption; I wanted to come up and see something about it, and the means, he had six months, and he got the property."

Q. Tell us about this deed, the deed that you made to the defendant.

A. In the first place he tried that before his father died. He fetched him a deed that he got made out in the fall of 1881, and I saw Smith's name on the papers. I accused him of having a mortgage on the place, and he said he did not. Finally, in 1882, he fetched it along; he asked me to sign it and to look at it; I told him I would not do it, and I sprang for it and he put it into the stove. There was nothing more said about it until 1883. I wanted some money. I sold a horse the year before and took a note for part and the other I let him have, and I demanded it to go east with; he hauled off a couple of loads of hogs and fetched me the money and said, "Now, will you give me

a deed to this place?" and I said, "No, sir, I will never sign a deed to this place so long as my head is hot." He said, "I have an injunction against you and will have you arrested in a day or two." He said "I want you to go to Hastings with me to-morrow;" and in the morning, asked me if I was going with him this morning, and I says, "I guess not," and he says the papers are in the officer's hands and he would have them served; that I could not go to Illinois; could not start out of the county; he had an injunction on everything I had and he would have it; he said he was going to have the place; had told me before he would be damned if he would ever leave the place and he was going to have it, he would be damned if he would ever leave it. I used to try to get him to go on his homestead after he had proved up on it. I cried nearly every night till I could not sleep, my health was poor. He said everything a man could say to a mother; when I was fussing with him about the pre-emption he called me a damned stinking bitch.

Q. What did he say to you in reference to your signing the deed?

A. He did not say much of anything, he would sit right in front of me.

Question by the court. When was this deed made?

A. The 23d day of May, 1883. I was sixty-seven years old the 19th of February last. In the spring of 1883, when this deed was made, my health was poor; was taken sick the October before with a disease that affected my nerves and my head; they call it Bright's disease. I was very poor and sick until after I married Mr. Munson. My husband died on May 30th, 1883. About that time my mind was wavering; I could not keep my mind at times when he would go to talk to me. I would be so sick I could not sleep, and cry and do nothing. It affected my health when I would cry; he would have me stop, and say the next thing there will be a doctor's bill to pay. At the time

of signing the deed he said that I would have to go ; that the papers were in an officer's hands and I would be arrested if I did not sign them.    I was afraid of him for two years. The neighbors would come to me and tell me what he would say he would do and was going to do.    I got into the wagon with him and he brought me to town.    He said he was going to have some one else there in the house, it was too lonesome for just him and me there.`    I was in fear of him all the time.    He brought me in that morning.    I signed the deed at Mr. Work's office; he was with me when it was done ; Mr. Work made out the writings and Thomas sat right in front of me; we were alone, was but one other man in and he went right out again ; I was in fear and trembling ; there was something said, and he says and damned and said, well, if it has to be done, it has to be done.

By the court.    What was the consideration of the deed, what did you get for it.

A.    I most forget what was in the writing.

Q.    Did you get anything for it ?  '

A.    I was to have one-third the crop (and that life lease) that year and so much stock with the kitchen furniture and everything of the kind.

The son, in his testimony, does not deny the essential facts stated by the mother.    Can a deed thus obtained be sustained?

In *Whelan v. Whelan*, 3 Cow., 537, Whelan, a man 74 years of age, owning considerable real estate, the father of seven children, and whose wife was sickly and irritable, was troubled for several years with dissensions among his children about the management of his property, the wife taking part with five of the children on one side, against the father, and William and John, two of the sons, taking part with the father and managing his farm.    The husband and wife separated, and an action being afterwards brought against the husband for his wife's support, William told his father that if he had anything to give him he

wished to know it, otherwise he would abandon the farm; that as his father and mother were acting they would soon have little enough for themselves; that thereupon it was agreed that the father should execute a deed of the farm to the two sons named. The court say (page 573): "The question here arises, what induced the appellant *at this time* to divest himself of all his property? The answer is obvious—his fears that his estate would be swept away for debts contracted by his wife. It is scarcely necessary to say that the supposition was groundless. His wife had been at board 13 weeks. The demand was afterwards settled for $25. A summons had issued to collect this small debt. This statement is enough to satisfy every mind that the appellant was bereft of ordinary understanding. If his ignorance and imbecility of mind were so great as to entertain such apprehensions for so slight a cause, it is evident he would become an easy prey to any designing knave who happened to possess his confidence." The court reviews the English cases up to the year 1824, and quotes with approval the language of Sir Samuel Romilly in *Huguenin v. Baseley*, 14 Ves., 273, in his reply, that "if it (the court) see that any arts or strategems or any undue means have been used, if it sees the least speck of imposition at the bottom, or that the donor is in such a situation with respect to the donee as may naturally give an undue influence over him, if there be the least scintilla of fraud, this court will and ought to interpose; and by the exertion of such a jurisdiction they are so far from infringing the right of alienation, which is the inseparable incident of property, that they act upon the principle of securing the full, ample, and uninfluenced enjoyment of it." The deed was canceled. Objection having been made in *Whelan v. Whelan* that the bill did not charge that the deed was procured by undue influence, the court say (page 571): "The bill charges the respondents with fraudulent artifices, management, and undue influence in obtaining

the deeds. It is, however, sufficient if from an examina-
tion of the whole bill the facts stated show that the re-
spondents necessarily had undue influence or control over
the appellant so that the parties did not treat on equal
terms. The rule that requires everything essential to the
appellant's right to be alleged is then satisfied. His
equity will then appear and the court may administer the
relief to which he is entitled."

In *Taylor v. Taylor*, 8 Howard, 183, a young lady just
of age received a bequest of a large amount of property
from a deceased uncle. Not long afterwards she wrote a
letter to her parents in which she stated her belief that the
bequest was intended for their benefit as well as hers and
that she wished to dispose of it in accordance with the wish
of the donor. A deed was thereupon prepared by an
attorney employed by her parents, and executed by her,
conveying the whole property to her mother for life, and
after her death to her children then surviving and her
heirs. The testimony showed that she had been treated
with unkindness by her parents and was anxious at the
time to obtain their consent to a marriage, which they
withheld until after the execution of the conveyance.
There was no testimony to show that her uncle intended
to create a trust. The court held that the case came fully
within the doctrine of *Huguenin v. Baseley*, and the con-
veyance was set aside, not only as to the mother, who had
procured it, but to those to whom the remainder had been
conveyed, although they had not procured the making of
the deed. In *McCormick v. Malin*, 5 Blackf., 509, a man
unacquainted with business and of feeble character was in-
duced to sell a legacy of thirteen thousand dollars for four
thousand five hundred dollars, by means of the influence
acquired over him by the purchaser, who took advantage
of his ignorance of affairs and eagerness to obtain the
money at once to lead him to believe that the legacy was
not worth a larger sum in hand and might not be paid for

many years. The court held that the transaction must be avoided on the ground of undue influence, if not of fraud. In *Whitehorn v. Hines*, 1 Mumford, 557, it was held that influence acquired by nursing and taking care of a young man of diseased body and enfeebled mind was sufficient to avoid a conveyance of his estate in consideration of a covenant to maintain and tend him during life, which had been imperfectly fulfilled.

In *Slocum v. Marshall*, 2 Wash. C. C. R., 397, a daughter was induced by her father to convey to him her reversionary interest in certain real estate after the expiration of his life estate as tenant by the curtesy, for the purpose of enabling him to make title to the property, with an understanding that he would hold it and its proceeds, if sold, for her benefit. The circumstances repelled the idea of fraud or improper motives on the part of the father, but there was no doubt the deed had been procured by the exercise of parental influence and had proved disadvantageous to the child, and this was held sufficient to render it voidable.

In *Sands v. Sands*, 24 Am. Law Reg., 544, a favorite son, taking advantage of his mother's affection, induced her to make a conveyance to him of all her estate, upon the assurance that the deed was in the nature of a will and would not take effect during her life-time. The mother was 73 years of age at the time of executing the deed, and greatly weakened in body and mind from sickness, so as to be incapable of transacting business. The deed was placed among her papers, and upon her recovery she destroyed it. It was held that the trial court erred in requiring the mother to execute another deed in place of the one destroyed, and in dismissing her cross-bill to have the conveyance set aside. To the same effect *Kleeman v. Peltzer*, 22 N. W. R., 793.

The leading case upon the question of undue influence and abused confidence is *Huguenin v. Baseley*, 14 Ves., 273

(2 Leading Cases in Equity and Notes), to which reference is made.

The result of the cases may be summed up, that where the coercion is not sufficient to amount to duress, but a social, moral, or domestic force is exerted on a party which controls the free action of his will and prevents any true consent in the making of a contract or the execution of a deed, equity may relieve against the same on the ground of undue influence even it would not be invalid at law. The doctrine of equity upon this subject is very broad, and as was said in *Smith v. Kay*, 7 H. L. Cas., 779, reaches every case and grants appropriate relief "where influence is acquired and abused or where confidence is reposed and betrayed."

In the case at bar the testimony shows beyond question that the mother was induced to execute the deed in controversy by the coarse language, threats, bluster, intimidation, and persistence of the son, and that it was not her voluntary act and deed.

This was sufficient to justify the court below in setting the deed aside. The evidence to establish the contract set up in the answer is too vague and indefinite to prove the same, and it is unnecessary to discuss that branch of the case.

So far as this record discloses, there is no excuse for the conduct of the defendant in his treatment of his aged mother. The property was purchased with her money, the result apparently of her industry, and it should be applied so far as may be necessary to her support and comfort during her declining years. The respect due from a child to parents and the desire to lighten the burdens and promote their happiness should be sufficient to prevent an unseemly wrangle over the parents' property or a desire to strip them of it while living. It is apparent that justice has been done, and the judgment is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.