Hartnett v. Hartnett.

JOHN HARTNETT, APPELLEE, V. THOMAS HARTNETT, APPELLANT.

FILED OCTOBER 2, 1894.    No. 5858.

Equity: DEEDS: UNDUE INFLUENCE. Where coercion is not suffi-
cient to amount to duress, but a social or domestic force is ex-
erted on a party which controls the free action of his will, and
prevents voluntary action in the making of a contract or execu-
tion of a deed for real estate, equity may relieve against the
same on the ground of undue influence. Doctrine announced
in *Munson v. Carter*, 19 Neb., 293 approved and followed.

APPEAL from the district court of Dakota county.
Heard below before NORRIS, J.

*Davis, Gantt & Briggs,* for appellant, cited: *Marshall
County High School Co. v. Iowa Evangelical Synod*, 28 Ia.,
360; *Finlayson v. Finlayson*, 3 L. R. A. [Ore.], 801; *Knapp
v. Bailey*, 79 Me., 195; *Miller v. Edgerton*, 38 Kan., 36;
*Fairchild v. Rasdall*, 9 Wis., 380*; *Clifton v. Jackson Iron
Co.*, 74 Mich., 183; 2 Parsons, Contracts, 782; *Bolt v.
Rogers*, 3 Paige Ch. [N. Y.], 154; *Goudy v. Gebhart*, 1 O.
St., 262; *Hendrickson v. Evans*, 25 Pa. St., 441; *Payne
v. Bruton*, 10 Ark., 53; *Blystone v. Blystone*, 51 Pa. St.,
374; *Nellis v. Clark*, 20 Wend. [N. Y.], 24.

*Jay & Beck, contra,* cited: *Munson v. Carter*, 19 Neb.,
293; *Borden v. White*, 44 N. J Eq., 291; *Pinger v. Pin-
ger*, 42 N. W. Rep. [Minn.], 289; *Catalani v. Catalani*,
24 N. E. Rep. [Ind.], 375; *Nolan v. Nolan*, 43 N. W. Rep.
[Mich.], 1078; *Dunn v. Dunn*, 7 Atl. Rep. [N. J.], 842;
*Whipple v. Barton*, 3 Atl. Rep. [N. H.], 922; *Tancre v.
Pullman*, 29 N. W. Rep. [Minn.], 171; *Davis v. Dean*, 26
N. W. Rep. [Wis.], 737; *Samson v. Samson*, 25 N. W.
Rep. [Ia.], 233; *Crawford v. Hoeft*, 24 N. W. Rep. [Mich.],
645; *Smith v. Smith*, 19 N. W. Rep. [Wis.], 47; *Ashton*

*v. Thompson*, 18 N. W. Rep. [Minn.], 918; *Sprague v. Hall*, 17 N. W. Rep. [Ia.], 743; *Thorn v. Thorn*, 16 N. W. Rep. [Mich.], 324; *Hanna v. Wilcox*, 5 N. W. Rep. [Ia.], 717; *Watkins v. Brant*, 1 N. W. Rep. [Wis.], 82; *Ikered v. Beavers*, 7 N. E. Rep. [Ind.], 326; *Oakley v. Ritchey*, 28 N. W. Rep. [Ia.], 448; *Bledsoe v. Bledsoe*, 1 S. W. Rep. [Ky.], 10; *Saunders' Appeal*, 6 Atl. Rep. [Conn.], 193; *Woodbury v. Woodbury*, 5 N. E. Rep. [Mass.], 275; *Porter v. Throop*, 11 N. W. Rep. [Mich.], 174; *June v. Willis*, 30 Fed. Rep., 11; *Webber v. Sullivan*, 12 N. W. Rep. [Ia.], 319; *O'Neil v. O'Neil*, 14 N. W. Rep. [Minn.], 59; *Maix v. McGlynn*, 88 N. Y., 357; *Smith's Will*, 52 Wis., 543; *Smith v. Smith*, 19 N. W. Rep. [Wis.], 47; *Weller v. Weller*, 19 N. E. Rep. [N. Y.], 433; *Goodrich v. Shaw*, 40 N. W. Rep. [Mich.], 187; *Fitch v. Reiser*, 44 N. W. Rep. [Ia.], 214.

HARRISON, J.

November 12, 1892, the plaintiff John Hartnett commenced an action against the defendant in the district court of Cedar county, alleging in the petition then filed that on December 18, 1890, he was the owner of real estate in Dakota county, Nebraska, more particularly described as follows: "East half of the southwest quarter, and the northwest quarter of section 12, township 28, range 7," and that on the last named date he conveyed to defendant, by warranty deed, a portion of the land, to-wit, "the east half of the southwest quarter of said section 12," and further pleading as follows: "The plaintiff further states that said warranty deed was procured from him by fraud and undue means, and that he was induced to sign and deliver the said deed to defendant by false and fraudulent statements and misrepresentations, and by threats of personal violence and by threatening to bring suit against plaintiff, made by defendant to this plaintiff, and that said deed was made wholly without consideration and was and is not the vol-

untary act and deed of the plaintiff but was induced and procured by fraud and misrepresentations and threats as aforesaid." The prayer of the petition is that the deed to defendant be canceled and plaintiff be decreed to be the owner of the land. On the 28th day of March, 1892, the plaintiff filed what is styled in the record "an amendment to the petition," which was as follows:

"1. Comes now the plaintiff and for amendment to his petition filed herein states and shows the court that the said deed described in the said petition of the plaintiff was procured from the plaintiff and he was induced to sign the same by false and fraudulent statements made to him by the defendant, and that the said defendant wanted to use said land for the purpose of inducing an uncle of the defendant to convey to defendant certain lands, and wanted the lands conveyed to himself and allowed to stand in his name for the sole purpose of procuring such conveyance, and the defendant, at and before the time the plaintiff conveyed said land to the defendant as described in the petition, promised to the plaintiff that immediately upon his securing the conveyance of the other lands from his uncle as aforesaid, he, the defendant, would at once reconvey the lands, described in the plaintiff's petition, to the plaintiff.

"2. That the lands as above set forth have been conveyed by the uncle of the said defendant to the defendant and are owned and held by him, but that the defendant, though often requested to do so, has refused to reconvey the said lands to the plaintiff."

To the petition and its amendment the defendant filed an answer, in which he admitted the conveyance of the land to him and denied, generally, each and every allegation not expressly admitted or otherwise answered, and for a further defense alleged that from the time he became capable of doing work on a farm, he worked for plaintiff on his farm in Dakota county continuously until defendant was about twenty-eight years old ; that after he arrived at the age of

twenty-one years it was understood between him and plaintiff that defendant should receive of plaintiff for such labor the reasonable value of the same, which he fixes at the sum of $2,000; that at or before the time of the conveyance of this land by plaintiff to defendant there was an accounting between them, at which time defendant demanded payment for his labor according to agreement, and that the conveyance of this land in controversy was made by plaintiff to defendant in payment for defendant's claim for labor, and accepted as such by him. The answer also contains what is denominated a "second and further defense," in which it is stated that plaintiff, at or before the time of the conveyance of this land to defendant, owned at different times in Dakota county tracts of land aggregating 1,600 acres and a large amount of personal property; that plaintiff had six children, and at or before the time of the conveyance of this land to the defendant the plaintiff made a division of his lands and personal property among his children, and the land in controversy in this case was conveyed to defendant as a portion of his share of the plaintiff's property, he being one of the plaintiff's sons. The answer closes with a prayer for a dismissal of the petition. There was a reply filed on behalf of plaintiff, in which it was admitted that defendant worked for plaintiff upon the farm during a portion of the time stated in the answer, and then alleged that defendant had been fully paid for all services rendered to plaintiff prior to the time of the execution of the conveyance of this land. The reply also contained a general or special denial of all the other allegations and statements of the answer. There was a trial of the issues to the court, a decree rendered in favor of plaintiff, from which defendant has appealed to this court.

The testimony in this case shows that at and prior to the time of the execution of the deed, which it is sought to annul, two of the sons of the plaintiff, one of them the defendant, were living on a farm with plaintiff, which be-

longed to him; that the two sons were working the farm together, and probably shared the proceeds of their joint efforts,—at least the bank account was in the name of Hartnett Brothers, and each carried a check book and drew upon it for money necessary for various purposes. The plaintiff was seventy-two, or seventy-three years of age, not in very good health and somewhat weak and feeble. He had, prior to the time of making this deed, given or conveyed to some of his children, of whom there were six in all, portions of his property, but the defendant had not received what he considered or claimed to be his share, and demanded and insisted he be given what he termed "his share," and with it that the tract of land included in the deed in controversy be conveyed to him; and on December, 1890, he received a conveyance of another piece of land, and twenty-six head of cattle and other personal property were turned over to him, and this deed in suit was executed and delivered. The only question which concerns us in this case is, what was the moving influence or reason which induced the plaintiff to make this particular deed? The testimony does not show that this tract of land was conveyed to defendant in payment of labor or as a part of any share of the estate to which he was in any manner or for any cause entitled, or because plaintiff considered that defendant had any right or claim to it, and we must turn to the evidence adduced on this point to discover why the deed was made and delivered to defendant. In the testimony of the plaintiff we find the following:

A. Well, he wanted a deed of me all the time and I would not give it to him; and then he went to his two brothers and talked to them about it and I would not give it to him. He threatened me several times—threatened my life; and then he went to his two brothers and talked to them about it. He said James got so much from me that he was going to get his uncle's place. He was going to marry John Ryan's daughter and get so much from her;

then he went to his two brothers and told them if I gave him that and he got his uncle's place, he would deed it. back.    *    *    *

Q. You say he threatened your life?

A. Yes, sir.

Q. Was that because you refused to make the deed?

A. Yes, sir.

Q. State what he said about that matter.

A. He told me first he would have "blood" if I didn't. give it to him.    One night he followed me into the bed-room and said he would kill me if I didn't give it to him.

      Cross-examination:

Q. Then the deed was not made on account of the threats?

A. I could not go from here to the door he was not after me threatening me.

Q. You didn't care anything about the threats, did you?

A. He would call me all sorts of names, and I thought he was pretty nearly insane.

Q. The threats didn't have any affect on you?

A. The threats and everything else had a hand in it.

Q. The real fact is you deeded it on account of those promises to deed it back?

A. Yes, sir.

Q. Was you afraid of him?

A. Yes, sir; I was afraid of him because I could not get from here to the door that I was not in dread that he would kill me.

Q. It was simply on one occasion?

A. He threatened me besides that.

Q. You was not afraid of him, was you?

A. I was not afraid of him that he would kill me; I knew he would not kill me.

      Redirect:

Q. As a matter of fact the deed was made by you and made through the representations made by him that he

would deed it back, and also by reason of the threats he made?

A. Yes, sir.

Q. Both of them compelled you to make the deed?

A. Yes, sir.

Q. And he kept the threats up continuously?

A. You are right he did.   I could not go any place unless he threatened me.

One of the brothers testified on this subject as follows:

Q. I will ask you to state if you ever heard any threats made against the plaintiff, your father.

A. He threatened to kill him.   I have heard him tell him: "You G—d d—n t—g s—n of a b—h, if you don't give me my rights I will kill you."

Q. Did you hear him threaten your father if he did not give him this land?

A. That was what he was after.

Q. He deeded him some land at the same time?

A. I couldn't say.   I didn't read the deed.   He said he did.

Q. Would he make those threats continuously?

A. I have heard him make them five or six times a day.

Q. Isn't it true that he would continuously keep them up pretty nearly?

A. Yes, sir.

The defendant in his examination in chief states:

Q. Did you ever make any of those threats that were testified to here in your presence this morning?

A. No, sir.

Q. You never made any of them?

A. Only one.   I never said I would kill him.   I threatened to sue him.   He gave me a piece of land and I asked him where it lay, and he gave me the numbers, and I said, "I don't understand the numbers."   I told him— I was pretty angry—I said I would have blood.   I meant so.   I didn't intend to kill him, or do any bodily harm.   I meant to sue him.

Q. Any language that you used in relation to that land meant that you would bring suit against him unless he would settle?

A. Yes, sir.

And during cross-examination testified:

Q. You told the old man you would have blood or this deed, didn't you?

A. Yes, sir.

Q. And the old man was sick at that time, wasn't he?

A. No, not that I know of.

Q. But the old man was in bed?

A. He was in bed that night, or going to bed. He was not in bed because he was sick. He had gone to bed for the night.

Q. The old man was in bed and you told him you would have that deed or you would have blood?

A. No, sir; I did not.

Q. What did you tell him?

A. I said I did not see what was to keep me from killing him, from bleeding him.

Q. You said that you would kill him, didn't you?

A. No, sir.

Q. Did you say if he said a word you would shoot him?

A. No, sir.

Q. What did you do that for then?

A. Because he kept me out of my rights.

Q. You meant to kill him, didn't you?

A. No, sir.

Q. What did you mean?

A. I meant to sue him.

We quote the foregoing portion of the testimony to show the general drift and import of the evidence given, as directed to the point now under consideration. One of the contentions of counsel for defendant is that the evidence of the promise by defendant to reconvey this land should not have been received, as, if received and considered, it would be violative of the rule that parol testimony

cannot be received for the purpose of changing or varying the terms of a written contract, and he cites a number of authorities to sustain his position. We do not think the citations apply in this case, as we do not consider the evidence of the promise to deed the land back can be viewed as establishing, or as introduced for the purpose of proving, that the deed was given on condition or to ingraft a condition upon it, or to invalidate it by showing there was no consideration for its execution, but rather as one of the elements of the influence which was exerted upon the father by the son, by which the will of the father was controlled and overcome and he was induced to execute the deed. This was but one of the facts and circumstances entering into the transaction, and as such was competent to be received and considered in the final determination of the issues between the parties, not as a controlling factor, in itself sufficient to entitle the plaintiff to relief, but as a constituent part of the plan or scheme, and of the means adopted by the defendant to effect his purpose of obtaining the deed for the land.

It is further insisted by counsel that plaintiff cannot recover for the reason that if the deed was made pursuant to an agreement between the plaintiff and defendant that it should be done to induce the uncle of defendant to convey to him a tract of land, it constituted an alliance between them for a fraudulent purpose, and the court will not hear the complaint of plaintiff or grant him any relief founded upon matters involved in such combination. There is a total absence of evidence in the record to show there was any agreement, or even expectation, that the conveyance of this land was to operate in any manner upon the uncle, or that it did so operate to induce or influence him to convey land or lands to the defendant, hence this can have no weight in determining the rights of the parties, as they must be governed by the facts shown in evidence.

We now reach the main question in the case, viz., whether

under all the evidence given in the case, the plaintiff shall be allowed the relief demanded, and this we conclude must be answered in the affirmative.   The rule by which we are guided in our consideration of the facts and circumstances in this case was announced in the case of *Munson v. Carter*, 19 Neb., 293, a case very similar in its leading and governing facts and incidents to the one at bar, where it was held: "Where coercion is not sufficient to amount to duress, but a social or domestic force is exerted on a party which controls the free action of his will, and prevents voluntary action in the making of a contract or execution of deed for real estate, equity may relieve against the same on the ground of undue influence;" and the author of the opinion, in the text, makes a statement which is so appropriate in its application to the facts in the case at bar that we will quote it here, viz.: "The testimony shows, beyond question, that the mother was induced to execute the deed in controversy by the coarse language, threats, bluster, intimidation, and persistence of the son, and that it was not her voluntary act and deed." The oft-repeated threats, abuse, and importunities of the son to the father operated on the will of the father and influenced and induced him to execute the conveyance in controversy, and we are satisfied that of his own will and volition, uninfluenced in the manner indicated, he would not have executed it.   This brings it within the rule, and we conclude that the decree of the district court was just and right. , In support of the doctrine of *Munson v. Carter, supra,* in addition to the cases therein cited and commented upon, we add the following: *Edwards v. Bowden,* 12 S. E. Rep. [N. Car.], 58 ; Pollock, Contracts, 524; 2 Pomeroy, Equity Jurisprudence, sec. 951; 1 Parsons, Contracts, 393, 395; 1 Chitty, Contracts, 269, 273; 2 Greenleaf, Evidence, sec. 301.   The decree of the lower court, in so much as it sets aside and annuls the conveyance described in plaintiff's petition, is

AFFIRMED.