Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/01/2026 09:20 AM CDT

In re Interest of Jordon B., a child
under 18 years of age.
State of Nebraska, appellee, v.
Leah B., appellant.

___ N.W.3d ___

Filed May 1, 2026.    No. S-25-551.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Equity: Appeal and Error.** In an appeal of an equity action, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
3. **Parental Rights.** A natural parent who relinquishes parental rights to a child by a valid written instrument gives up all rights to the child at the time of the relinquishment.
4. ____. A valid relinquishment of parental rights is irrevocable.
5. **Parental Rights: Adoption.** In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights and consent to adoption signed by a natural parent knowingly, intelligently, and voluntarily is valid.
6. **Parental Rights: Proof.** The burden is on the natural parent challenging the relinquishment to prove it is invalid.
7. **Equity: Evidence: Proof.** Generally, in an equitable action, the party with the burden of proof must meet that burden by clear and convincing evidence.
8. **Equity: Jurisdiction: Child Custody: Adoption.** Disputes over child custody and challenges to adoption lie within a court's equity jurisdiction.

9. **Parental Rights: Evidence: Proof.** A parent's burden of proof in seeking to invalidate a relinquishment of parental rights is by clear and convincing evidence.

10. **Evidence: Proof: Words and Phrases.** Clear and convincing evidence is evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved.

11. **Parental Rights: Mental Competency.** Impaired mental powers do not necessarily render someone incapable of knowingly, intelligently, and voluntarily executing a relinquishment of parental rights; the question is whether the parent was capable of understanding the meaning, design, and effect of the act of relinquishment.

12. **Duress: Words and Phrases.** To constitute duress, there must be an application of such pressure or constraint as compels a person to go against that person's will and takes away that person's free agency, destroying the power of refusing to comply with the unjust demands of another.

13. **Parental Rights: Duress.** Stress alone, whether financial or personal, does not rise to the level of duress that would negate a valid relinquishment.

14. **Duress.** A threat to do what one has a legal right to do cannot constitute duress.

15. **Contracts: Duress: Words and Phrases.** Coercion is a social or domestic force exerted on a party, which is not sufficient to amount to duress but controls the free action of that party's will and prevents voluntary action in the making of a contract.

16. **Fraud.** What constitutes fraud is a matter of fact in each case and may consist of either fraud in the inducement or fraud in the execution, through words, acts, or the suppression of material facts with the intent to mislead and deceive.

17. **Parental Rights.** Noncompliance with communication and contact agreements in any form is not an invalidating condition of a relinquishment of parental rights.

18. ____. Noncompliance with any communication and contact agreements may not be the basis for revoking a relinquishment to the Department of Health and Human Services.

19. ____. A change of attitude subsequent to signing a relinquishment is insufficient to invalidate it.

Appeal from the County Court for Dodge County: Thomas J. Klein, Judge. Affirmed.

Lisa M. Gonzalez, of Johnson & Pekny, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, Jennifer D. Joakim, and Leslie E. Remus, and Steven J. Twohig, of Twohig Law, L.L.C., guardian ad litem, for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, Bergevin, and Vaughn, JJ.

Freudenberg, J.

## I. INTRODUCTION

Leah B., the biological mother of Jordon B., appeals from the juvenile court's order denying her motion to rescind her relinquishment of parental rights to Jordon. Leah was represented by counsel but not by a guardian ad litem during the relinquishment process. She argues the juvenile court erred by finding she voluntarily executed the relinquishment, despite evidence of her having a mild intellectual disability and her testimony that threats and promises made by family members influenced her decision.

## II. BACKGROUND

Leah is the biological mother of three living children: Jacob B., Lucas B., and Jordon. According to a report from the Department of Health and Human Services (DHHS), Leah had a fourth biological child who had died due to a failure to thrive. Allen B. is the biological father of all four children and was married to Leah until 2024.

Jacob and Lucas were removed from Leah and Allen's home as infants in 2014 and 2016, respectively. Leah relinquished her parental rights to Jacob and Lucas, as did Allen, and Leah's father and stepmother adopted them. Leah was represented by counsel for the relinquishments. She was not appointed a guardian ad litem. Leah receives disability benefits for her back and mental health conditions.

In September 2020, Jordon, a newborn, was removed from Leah and Allen's home due to concerns about Leah and Allen's ability to care for him and maintain safe living conditions.

Leah admitted to the allegations of the juvenile petition, and Jordon was adjudicated under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016).

Jordon was initially placed with Leah's father and stepmother. Leah's father and stepmother later expressed they were unable to care for Jordon's needs in addition to those of his older siblings, and he was placed with another family. Following a multiday trial and an appeal[1] over a change of placement, Jordon was placed with Allen's cousin, Rita P., in November 2021, where he has since remained.

### 1. Relinquishment

The permanency plan for Jordon was reunification with a concurrent plan of adoption. Nevertheless, in November 2022, when Jordon was 2 years old, Leah relinquished her parental rights to Jordon by completing and signing a DHHS form titled "Relinquishment of Child by Parent," as did Allen.

Leah's relinquishment was notarized by Leah's court-appointed attorney, who attested at the bottom of the form that Leah "executed the foregoing relinquishment and acknowledged the same to be a voluntary act and deed." Allen and three DHHS employees were also present at the relinquishment. Leah neither requested nor was appointed a guardian ad litem in relation to Leah's relinquishment of her parental rights to Jordon.

In January 2023, DHHS issued Leah a "Relinquishment Acceptance Letter," confirming that she had voluntarily relinquished her parental rights to Jordon in the presence of her attorney and that all documents were explained to her by a DHHS representative. The letter stated that acceptance of the relinquishment was effective from the date of relinquishment in November 2022.

Rita adopted Jordon in June 2023.

---

[1] See *In re Interest of Jordon B.*, 312 Neb. 827, 981 N.W.2d 242 (2022).

## 2. Motion Challenging Validity of Relinquishment and Appeal

In May 2023, approximately 1 month before Rita adopted Jordon, Leah filed a pro se motion asserting either that she signed the relinquishment involuntarily, under threat, coercion, or duress, or that she did not sign it knowingly, intelligently, and voluntarily. She alleged she was developmentally disabled and should have been appointed a guardian ad litem. She set forth several allegations of coercion and duress by Allen and extended family members, including Rita, but also alleged the "entire state team" knew of her disability and manipulated and lied to her.

Following a hearing in which Leah appeared pro se and no evidence was proffered, the court denied the motion. Leah appealed. In a decision issued in June 2024,[2] we reversed the court's order and remanded the cause for a meaningful evidentiary hearing on the validity of Leah's relinquishment of parental rights.

## 3. Evidentiary Hearing on Remand

At the hearing on remand, which took place in March 2025, Leah was represented by counsel. Additionally, the court appointed her a guardian ad litem. At the time of the hearing, Jordon was 4 years old.

### (a) Leah's Testimony

Leah generally testified that Allen and his family made false promises and pressured her to sign the relinquishment. She testified she was vulnerable to that pressure because of intellectual challenges and emotional abuse by Allen and his mother.

Leah testified that when they were married, Allen manipulated her. She described that Allen did not permit her to have any contact with her parents, sister, or grandparents, and

---

[2] See *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024).

generally isolated her. Leah testified that Allen told her that she would be incapable of caring for Jordon if they broke up. Leah said Allen was verbally abusive to her and threatened her life if she did not "switch Jordon to Rita's place." According to Leah, Allen made it clear that if she did not sign the relinquishment for Jordon, "he would make [her] life a living hell." Leah testified that Allen told her Jordon would be safer with Rita. Leah felt like she had "no control over what [she] was allowed to do."

Leah testified that Rita had promised her and Allen that if they signed the relinquishment, they could move in with Rita and Jordon and still be Jordon's "mom and dad." Alternatively, "[Rita] would buy a place" for Leah and Allen "and let [them] still raise Jordon." In either case, Rita would be there to help them if they needed help. According to Leah, Rita also promised her and Allen that she would help them acquire a reliable vehicle. Leah described that Allen's mother was involved in these conversations and that Allen's mother had a history of verbally abusing her. She acknowledged that DHHS was not involved in these discussions.

Leah testified she did not participate in relinquishment counseling because Allen told her and the DHHS representatives that he and Leah did not need it. Allen said he and Leah "knew exactly what [they] were doing," since they had been through the same process before. According to Leah, Allen was present during every meeting in the juvenile case, including at meetings with her own attorney. She did not have her own transportation, so it was Allen who drove her to all the meetings, including the meeting to sign the relinquishment. Leah testified that DHHS did not offer to give her relinquishment counseling separately from Allen. Leah believed that if she had been able to meet with DHHS representatives separately, she would not have signed the relinquishment.

In January 2023, following DHHS' acceptance of her relinquishment, Leah moved to Arkansas to be with her boyfriend. After her return, Leah obtained a protection order in April

2023 against Allen. A motion to vacate the protection order was filed in June 2023, and later that same month, the motion was denied. According to Leah, Allen and Rita convinced her to move to vacate the protection order by promising her Rita would let her see Jordon if she did. Similarly, Rita had asked Leah to drop her motion to rescind her relinquishment, promising her that, if she did, she could see Jordon.

Leah acknowledged she had her own attorney present when she signed the relinquishment. She acknowledged that she was asked if anyone was forcing or threatening her to relinquish and that she answered no.

Leah acknowledged she had voluntarily signed the relinquishments of parental rights to Jacob and Lucas after fully participating in relinquishment counseling. When she signed those relinquishments, she understood the legal consequences of a relinquishment. Leah conceded that she had that same full understanding of the legal consequences when she signed the relinquishment for Jordon. Leah explained that she sought to rescind her relinquishment of parental rights to Jordon not because she sought custody of him, but, rather, to facilitate Jordon's being placed back with Leah's father and stepmother. Leah thought that Jordon should be with his older brothers.

### (b) Allen's Testimony

At the hearing, Allen denied ever physically and verbally abusing Leah or attempting to isolate her. He denied making any threats or promises in relation to Leah's relinquishing parental rights to Jordon. Allen testified that no one told him or Leah that they could see Jordon if Rita adopted him; however, Allen assumed that they would be able to.

### (c) Rita's Testimony

Rita testified that in approximately 10 years of interacting with Leah and Allen as a couple, she never observed anything that led her to believe Allen was abusive toward Leah. Rita

testified it was Leah and Allen's idea to have Jordon placed in her home, and she never threatened Leah or promised anything in exchange for Leah's eventual relinquishment. Rita testified she did not tell Leah she could move into Rita's house and did not promise a house or vehicle. Further, Rita never promised Leah that she could see Jordon if he was adopted.

Rita acknowledged she had discussed with Leah and Allen that they would all likely continue to see each other for family dinners and holidays and "just be a normal family." Rita knew that Leah and Allen wanted her to adopt Jordon because they thought they could interact with him more in her home than they would be able to if Leah's father and stepmother adopted him. Rita purchased a vehicle for Leah and Allen sometime after November 2022, after the relinquishment, to facilitate Allen's transportation to and from his employment.

Rita testified that, since the adoption, she has never refused to allow Leah to visit Jordon. Rita's only conditions are that Leah find her own transportation and come separately from Allen if there is a protection order in place. Because of those conditions, Leah has not continued to have contact with Jordon.

When Rita heard about Leah's intention to invalidate her relinquishment of her parental rights to Jordon, she called Allen. He was with Leah when Rita called. Leah told Rita that if she did not invalidate her relinquishment for Jordon, her father and stepmother would not permit her to visit her two older children. Rita observed that Allen took Leah to the first hearing on Leah's pro se motion to invalidate her relinquishment, even though there was still an active protection order against Allen at that time.

(d) Allen's Mother's Testimony

Allen's mother testified that she never threatened Leah or promised her anything if she signed the relinquishment of parental rights. She testified that she never physically assaulted Leah but that Leah had once physically assaulted

her. Allen's mother was living at Rita's house at the time of the hearing. Allen's mother testified that since Allen's divorce from Leah, he stayed overnight at Rita's house once or twice a week.

### (e) Case Manager's Testimony

Jack Leonard, the case manager for Jordon's case since shortly after Jordon's removal from Leah and Allen's home, testified that he spoke frequently with Leah over the course of 2½ years. During such conversations, Allen often was not present. When Leonard saw Leah and Allen together, he observed Leah call Allen names and belittle Allen over his attempts at parenting. Leonard had concerns about Leah and Allen's ability to coparent.

Leonard described that the case file for the family contained prior intakes over the last 10 years, which noted concerns over Leah's behavior toward Allen. In one intake where law enforcement was called, Leah was believed to have been the aggressor in a physical altercation with Allen. Other intakes reported Leah's belittling Allen. Leonard did not believe Leah's behavior amounted to domestic violence. He testified, "We just kind of chalked it up to Leah running the household and then Allen being kind of more of a submissive partner and then doing kind of what Leah tells him to do."

Leonard did not personally observe anything that would have led him to believe Leah was the victim of domestic violence. Given the amount of contact with the family during the years between the initial intake and the relinquishment, as well as the years of appeals related to the case, he would have expected to see some evidence of domestic violence, if it existed. Nothing in his training suggested to him that Leah was the victim of psychological or physical abuse by Allen.

Leonard testified that Leah raised the issue of relinquishing her parental rights to Jordon shortly after Jordon was placed with Rita. They had several private conversations on the topic after their team meetings. Their initial conversations about

relinquishment began in 2021, and the relinquishment did not occur until November 2022. Leonard repeatedly told Leah that the plan was reunification, she was making a lot of progress, and there was no need to consider relinquishment at that stage. Despite this, Leah repeatedly expressed concerns over her father and stepmother's resistance to the change of placement and her not wanting them to adopt Jordon. She feared that if her father and stepmother, instead of Rita, adopted Jordon, she would never be able to see Jordon again.

Leonard testified he and Leah had conversations about this "quite frequently." During those conversations, he and other support workers tried to encourage Leah to keep on the path to reunification. They discouraged Leah from considering relinquishing her parental rights out of fear that if she did not, Jordon would be adopted by her father and stepmother. Still, Leah persisted in pursuing relinquishment. By July 2022, Leah had chosen to "quit participating in visits."

Leonard recalled speaking with Leah multiple times, without Allen present, about the need to participate in relinquishment counseling. According to Leonard, "The team insisted that [Leah] participate" in the counseling even if she had relinquished her rights to her other children. Leah refused to participate in the relinquishment counseling, explaining she did not want to delay relinquishment because she had plans to move out of state with a new boyfriend. According to Leonard, Leah "just wanted to get this done and over with" and "made it clear that she understood everything because she's already gone through it before."

Leonard testified that Leah never expressed any concerns about Jordon's placement with Rita, stating that Leah, in fact, "had nothing but positive things to say" about Rita. Leonard described that the communication between the caseworkers and Rita was very open and that he had "absolutely no evidence, no indication" of anyone making promises to Leah of contact with Jordon, vehicles, money, housing, or other financial gains in exchange for the relinquishment. He also noted that Rita "did

not have the financial means to provide such or to make those promises in the first place."

As was customary with any placement while working on reunification, Leonard had discussed with Rita that she was only approved for placement and should not engage in any discussions with Leah and Allen about relinquishment. Also, generally, as part of the relinquishment signing process, a caseworker will ask parents if anyone promised anything to them in exchange for the relinquishment. Leonard was aware of Leah's and Allen's general expectations that Rita would permit them to see Jordon if she adopted him. However, he understood that expectation was simply due to Jordon's being placed with a family member who had been "a positive support."

Due to concerns about Leah's comprehension, Leonard had referred Leah for a neuropsychological evaluation to determine if a guardian ad litem should be appointed for her. The evaluation report, which was completed in 2021, described Leah's intelligence quotient as being below average, which the evaluation report set forth could potentially qualify Leah for a diagnosis of mild intellectual disability. The report also indicated that Leah's cognitive weaknesses, coupled with her comparatively quick processing skills, could make her appear to understand more than she does. The report did not address whether Leah was incapable of knowingly, intelligently, or voluntarily executing a relinquishment or any contractual agreement. Although Leah's intelligence quotient scores were below average, following an "extensive conversation" and consultation with the evaluating neuropsychologist, it was determined that Leah did not require a guardian ad litem. Leonard explained that Leah had enough support through her attorney, DHHS, and other providers. Leah "had quite a few services in place to make sure that she was being advocated for." Further, "[s]he was able to comprehend and do tasks specifically given to her by providers during visits . . . ."

Leonard testified he witnessed Leah sign the relinquishment, and she did not indicate any reluctance. To the contrary,

Leah "couldn't sign it fast enough." Leah appeared "jovial, happy," and "in good spirits." Leonard testified that based upon his extensive involvement with all the parties and experience with the case, he believed Leah gave her relinquishment freely, knowingly, and without coercion.

### (f) Court-Appointed Attorney's Testimony

Adam Tripp, Leah's court-appointed attorney from October 2020 through April 2023, testified that Leah informed him she wished to relinquish her parental rights because she was not in a position where she could provide for Jordon's care. Tripp testified that he met with Leah frequently and that she called his office often. At times, Allen was present for their meetings. At other times, he was not. Tripp was aware that Leah had some mild cognitive functioning problems but did not believe Leah required a guardian ad litem. He discussed with Leah the consequences of a relinquishment. Leah did not reach out to him after the relinquishment to express any concerns. As Leah's attorney and the notary to her signature on the relinquishment, Tripp believed Leah was signing her relinquishment freely, voluntarily, and intelligently.

### (g) DHHS Employee's Testimony

Heather Johnson, a child and family services specialist with DHHS trained in accepting relinquishments of parental rights, was the assigned specialist to receive the relinquishment of Leah's parental rights to Jordon. She testified at the hearing that when she takes a relinquishment of parental rights, she observes the participants to screen for any concerns of domestic violence or other issues relevant to voluntariness. Johnson said that the relinquishment of parental rights to Jordon was "calm and . . . pleasant." Leah was "engaging and pleasant to work with" and "conveyed no aggression, no abrupt sadness." Johnson testified that Leah mentioned being familiar with the process, because she had

relinquished her rights to two other children. Leah conveyed that "[s]he was understanding of the process and so it did not impact her the same way as it would a parent who was completing this process for the first time."

Johnson testified that she filled out the relinquishment questionnaire, transcribing verbatim Leah's answers. Leah said that relinquishing Jordon for adoption meant a "more suitable and safe environment for my son," she was satisfied with the information and assistance she received, and she decided to relinquish Jordon to give him a "more . . . suitable home than we can give him." Leah affirmed to Johnson that she understood her relinquishment could not be revoked and that it involved the complete loss of all rights and responsibilities. Leah also told Johnson that she had not been promised anything or threatened in any way regarding relinquishing Jordon and that her relinquishment was a free and voluntary act done with her full understanding and knowledge of the consequences. Johnson believed Leah relinquished her parental rights voluntarily and with full knowledge of what the relinquishment entailed.

### 4. Order Denying Motion to Rescind Relinquishment

Following the evidentiary hearing on remand, the juvenile court overruled Leah's motion to rescind her relinquishment of parental rights. The court found that Leah's relinquishment was not the result of fraud, coercion, duress, threats, or promises and that Leah freely, voluntarily, intelligently, and knowingly executed her relinquishment. Among other facts, the court highlighted that Leah initiated relinquishing her parental rights and repeatedly expressed her desire to sign a voluntary relinquishment, despite Leonard's insistence that she was on the path to reunification. Leah also repeatedly refused relinquishment counseling because she said she understood the process. She was calm and showed no signs of being forced or

coerced when she signed the relinquishment, and she demonstrated she understood the legal consequences of executing a voluntary relinquishment. She participated in numerous meetings where she was informed of her rights and the repercussions of the relinquishment. She indicated she understood the consequences of signing the voluntary relinquishment, and the neuropsychological evaluation did not reach any conclusions or opinions regarding Leah's inability to do so. The court found that Leah had moved to rescind her relinquishment of parental rights in order to facilitate Jordon's being placed with her family members, not to regain custody.

## III. ASSIGNMENTS OF ERROR

Leah assigns that the juvenile court erred in finding that her relinquishment of parental rights (1) did not result from fraud, coercion, duress, or threats and (2) was knowingly, intelligently, and/or voluntarily executed.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.[3]

[2] In an appeal of an equity action, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[4]

## V. ANALYSIS

The issue presented is whether Leah's relinquishment was valid. Leah argues she proved the relinquishment was the result of threats, coercion, fraud, and/or duress because Allen,

---

[3] *Id*. See, also, *Jesse B. v. Tylee H.*, 293 Neb. 973, 883 N.W.2d 1 (2016); *Gomez v. Savage*, 254 Neb. 836, 580 N.W.2d 523 (1998).

[4] See *Perkins v. RMR Building Group*, 320 Neb. 707, 30 N.W.3d 148 (2026).

Rita, and Allen's mother made threats and promises to induce her to sign the relinquishment. She also argues she proved she did not sign the relinquishment knowingly, intelligently, and voluntarily due to her mild intellectual disability, in conjunction with her lack of a guardian ad litem and past trauma relating to the relinquishment of her parental rights to Jordon's two older siblings.

[3,4] Neb. Rev. Stat. § 43-106.01 (Reissue 2016) states, in part:

> When a child shall have been relinquished by written instrument, as provided by sections 43-104 and 43-106, to [DHHS] or to a licensed child placement agency and the agency has, in writing, accepted full responsibility for the child, the person so relinquishing shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such child.

Accordingly, a natural parent who relinquishes parental rights to a child by a valid written instrument gives up all rights to the child at the time of the relinquishment.[5] A valid relinquishment of parental rights is irrevocable.[6]

[5,6] In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights and consent to adoption signed by a natural parent knowingly, intelligently, and voluntarily is valid.[7] The burden is on the natural parent challenging the relinquishment to prove it is invalid.[8]

[7-10] Generally, in an equitable action, the party with the burden of proof must meet that burden by clear and

---

[5] See *Monty S. & Teresa S. v. Jason W. & Rebecca W.*, 290 Neb. 1048, 863 N.W.2d 484 (2015).

[6] *Id*.

[7] *Id*.

[8] See *id*.

convincing evidence.[9] Disputes over child custody and challenges to adoption lie within a court's equity jurisdiction.[10] Thus, like other jurisdictions, we hold that a parent's burden of proof in seeking to invalidate a relinquishment of parental rights is by clear and convincing evidence.[11] Clear and convincing evidence is evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved.[12]

[11] In our de novo review, we agree with the juvenile court that Leah failed to prove that she executed the relinquishment unknowingly, unintelligently, or involuntarily. We base our analysis of Leah's claim of mental incapacity to relinquish parental rights consistently with the law regarding mental incapacity to execute a contract generally.[13] Impaired mental powers do not necessarily render someone incapable of knowingly, intelligently, and voluntarily executing a

---

[9] See, *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021); *Goff v. Weeks*, 246 Neb. 163, 517 N.W.2d 387 (1994); *Pruss v. Pruss*, 245 Neb. 521, 514 N.W.2d 335 (1994); *Bock v. Bank of Bellevue*, 230 Neb. 908, 434 N.W.2d 310 (1989); *In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986); *Qualsett v. Abrahams*, 23 Neb. App. 958, 879 N.W.2d 392 (2016). Compare, e.g., *In re Adoption of Kate S.*, 315 Neb. 795, 1 N.W.3d 502 (2024), with *In re Interest of Johnny H.*, 320 Neb. 675, 29 N.W.3d 808 (2026). But see *State, ex rel. Bize, v. Young*, 121 Neb. 619, 237 N.W. 677 (1931).

[10] See *Jesse B. v. Tylee H., supra* note 3.

[11] See, *In re J.W.B.*, 659 Pa. 561, 232 A.3d 689 (2020); *In re Adoption of S.R.T.*, 362 Mont. 39, 260 P.3d 177 (2011); *In re Cesar L.*, 221 W. Va. 249, 654 S.E.2d 373 (2007); *Hagy v. Pruitt*, 339 S.C. 425, 529 S.E.2d 714 (2000); *In re Adoption of B.T.D.*, 68 P.3d 1021 (Utah App. 2003); *D.C. v. J.C.*, 842 So. 2d 17 (Ala. Civ. App. 2002); *Matter of Navajo County Juv. A. JA-691*, 171 Ariz. 369, 831 P.2d 368 (Ariz. App. 1991). See, also, Colo. Rev. Stat. Ann. § 19-5-104 (West Supp. 2025); N.C. Gen. Stat. § 48-3-707 (2007). But see *In re N.P.T.*, 169 S.W.3d 677 (Tex. App. 2005).

[12] *Malousek v. Meyer, supra* note 9.

[13] See, e.g., *Faulkenberry v. Elkins*, 213 Ga. App. 472, 445 S.E.2d 283 (1994).

relinquishment of parental rights[14]; the question is whether the parent was capable of understanding the meaning, design, and effect of the act of relinquishment.[15]

Leonard, Tripp, and Johnson all testified as to their observations that Leah understood the meaning, design, and effect of her act of signing the relinquishment. Leonard testified he had extensive conversations and consultations with Leah and was confident that Leah understood the implications of a relinquishment and that she did not require a guardian ad litem. Tripp also consulted with Leah regularly and, although he was aware of her mild cognitive functioning issues, he expressed no concerns that Leah did not fully understand the consequences of the relinquishment. Tripp did not believe Leah required a guardian ad litem. Johnson testified she was trained to make observations related to cognitive abilities and indicated she would not have recommended accepting Leah's relinquishment if there had been any concerns.

Leah told Johnson during the questionnaire process that she understood her relinquishment could not be revoked and that it involved the complete loss of all rights and responsibilities relating to Jordon. Leah herself testified at the hearing that she had the same understanding when she executed the relinquishment of her rights to Jordon as she did when she relinquished her rights to his older siblings and that she had voluntarily relinquished her rights to her older children with a full understanding that she would no longer have any parental rights. While there was some evidence Leah was upset by her father's and stepmother's actions after they adopted her two older children, there was no evidence Leah experienced a level of trauma from the past relinquishments that rendered her incapable of acting knowingly, intelligently, and voluntarily in executing her relinquishment of her parental rights to Jordon.

---

[14] See *Marston v. Drobny*, 166 Neb. 747, 90 N.W.2d 408 (1958).

[15] See, *In re Estate of Disney*, 250 Neb. 703, 550 N.W.2d 919 (1996); *Marston v. Drobny, supra* note 14.

[12-14] Likewise, the juvenile court did not err in finding that Leah failed to prove threats, coercion, fraud, or duress invalidated her relinquishment. To constitute duress, there must be an application of such pressure or constraint as compels a person to go against that person's will and takes away that person's free agency, destroying the power of refusing to comply with the unjust demands of another.[16] Stress alone, whether financial or personal, does not rise to the level of duress that would negate a valid relinquishment.[17] Threats are closely related to duress and must be sufficient to "'overcome the mind and will of an ordinary man.'"[18] A threat to do what one has a legal right to do cannot constitute duress.[19]

[15,16] Coercion has been described by this court as a social or domestic force exerted on a party, which is not sufficient to amount to duress but controls the free action of that party's will and prevents voluntary action in the making of a contract.[20] What constitutes fraud is a matter of fact in each case and may consist of either fraud in the inducement or fraud in the execution, through words, acts, or the suppression of material facts with the intent to mislead and deceive.[21]

It is clear from the court's order that it accepted Allen's, Rita's, and Allen's mother's versions of events over Leah's claims of abuse, threats, and false promises. In other words, the juvenile court found that no one threatened, promised, deceived, or otherwise overcame Leah's free agency to induce her to sign the relinquishment. We will defer to the juvenile

---

[16] See *Haumont v. Security State Bank*, 220 Neb. 809, 374 N.W.2d 2 (1985).

[17] *Hensman v. Parsons*, 235 Neb. 872, 458 N.W.2d 199 (1990).

[18] *Unangst v. Southwick*, 80 Neb. 112, 118, 113 N.W. 989, 992 (1907), *modified on rehearing* 80 Neb. 119, 116 N.W. 864 (1908). See, also, *Farmers State Bank v. Dowler*, 112 Neb. 262, 199 N.W. 528 (1924).

[19] *Malec v. ASCAP*, 146 Neb. 358, 19 N.W.2d 540 (1945).

[20] See *Hartnett v. Hartnett*, 42 Neb. 23, 60 N.W. 362 (1894).

[21] See, *Cullinane v. Beverly Enters. - Neb.*, 300 Neb. 210, 912 N.W.2d 774 (2018); *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002).

court's credibility determinations for these witnesses,[22] giving weight to the fact that the judge heard and observed the witnesses and accepted one version of the facts rather than another.[23]

[17,18] Further, as the juvenile court noted, even if Rita had made promises of continued contact that she has not honored, noncompliance with communication and contact agreements in any form is not an invalidating condition of a relinquishment of parental rights.[24] Thus, noncompliance with any communication and contact agreements may not be the basis for revoking a relinquishment to DHHS.[25]

[19] The facts of this case share some similarities to those presented in *Auman v. Toomey*,[26] wherein we affirmed the lower court's determination that a biological mother's relinquishment of parental rights and consent to adoption of her 22-month-old child was valid. The mother had initiated the process of relinquishment and told the attorney who was representing the prospective adoptive couple that she had been considering relinquishing her parental rights for some time. She was repeatedly advised that signing the relinquishment would deprive her of all rights to the child and that it was final and irrevocable. She was also advised of the availability of foster care, which she rejected as unworkable, as well as her right to an attorney. She appeared coherent and participated actively in the meetings with the attorney about the relinquishment. After the mother relinquished her parental rights, her parents voiced their opposition and offered to take the child for 5 years to allow the mother and the child's biological father to work

---

[22] See *Tegra Corp. v. Boeshart*, 317 Neb. 100, 8 N.W.3d 786 (2024).

[23] See *Perkins v. RMR Building Group, supra* note 4.

[24] See *Maria T. v. Jeremy S.*, 300 Neb. 563, 915 N.W.2d 441 (2018). See, also, Neb. Rev. Stat. §§ 43-162 to 43-166 (Reissue 2016 & Cum. Supp. 2024).

[25] See *id*.

[26] *Auman v. Toomey*, 220 Neb. 70, 368 N.W.2d 459 (1985).

out their problems, and the mother attempted to revoke her relinquishment. At the trial in her action for a writ of habeas corpus, the mother's therapist testified that the mother had impaired judgment and was unable to correctly assess the consequences of her actions when she signed the relinquishment. Furthermore, the mother testified she believed she had 2 weeks after signing the relinquishment to change her mind. She also described financial stress and a lack of support from the child's father. We found that the evidence showed the mother changed her mind and succumbed to the influence of relatives only after the relinquishment had been signed. And we held that a change of attitude subsequent to signing a relinquishment is insufficient to invalidate it.[27]

Leah proposed the idea of relinquishment and insisted on proceeding with the relinquishment process, despite contrary advice. She did not seek to invalidate her relinquishment of parental rights until approximately 6 months after she signed it. Even then, she did not wish to regain custody. Rather, she sought to regain her parental rights to facilitate a change of placement due to a change of attitude toward her family members and Rita.

The evidence supports the conclusion that Leah had a change of attitude subsequent to the relinquishment. Leah did not prove by clear and convincing evidence that the relinquishment was the product of threats, coercion, fraud, or duress.

## VI. CONCLUSION

Because Leah failed to prove her relinquishment was invalid, we affirm the order of the juvenile court.

Affirmed.

---

[27] *Id.* See, also, *Monty S. & Teresa S. v. Jason W. & Rebecca W., supra* note 5.